UNITED STATES of America, Appellee,

v.

Aart VANWORT, Walter Cabral, Jeanmarie Chapoteau, Vincent Cicali, Michael Crown, Alexander Donchenko, Bruce Duignan, Daniel Dymenstein-Kremer, Richard Keim, Richard Hopkins, Temistocles Moura–Torres, Claudio Petenucci, Gessi Prado, Henrique Rajas, Anthony Ruotolo, Sergio Stofel-DeCastro, Nahid Tabibi, Christianus Vanwort, Eduardo Varitzo, Michael Za-

---

**4.** *See supra* note 3.

charias, Pedro DaSilva, Alfred Donchenko, Alexander Fontanelle, Steven M. Finn, Defendants.

Appeal of Jeanmarie CHAPOTEAU, Michael Crown, Pedro DaSilva, Steven M. Finn, Bruce Duignan, Vincent Cicali, Defendants.

Nos. 942–945, Docket 88–1221 to 88–1223 and 88–1227.

United States Court of Appeals, Second Circuit.

Argued April 24, 1989.

Decided Sept. 26, 1989.

Erica Horwitz, New York City, for Chapoteau.

Anthony J. Falanga, Carle Place, N.Y., for Crown.

Brian W. Wice, Houston, Tex. (Don Ervin, Houston, Tex., of counsel), for DaSilva.

Joseph J. Balliro, Boston, Mass. (Balliro, Mondano & Balliro, Boston, Mass., of counsel), for Finn.

Nicholas M. De Feis, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., David C. James, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y., of counsel), for appellee.

Before OAKES, Chief Judge, and WISDOM * and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

Jeanmarie Chapoteau, Michael Crown, Pedro DaSilva and Steven M. Finn appeal from judgments of conviction entered in the United States District Court for the Eastern District of New York, Dearie, *J.*, following a narcotics trial.[1]

Chapoteau was convicted of conspiracy to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(ii)(II) (1982 & Supp. V 1987). He was also convicted of one sub-

---

* Honorable John Minor Wisdom, United States Circuit Judge for the Fifth Circuit, sitting by designation.

1. The appeals of Vincent Cicali and Bruce Duignan were withdrawn.

stantive count each of importing cocaine and attempting to possess cocaine with intent to distribute it. 21 U.S.C. §§ 952(a), 960(a)(1), 960(b)(1)(B), 846, 841(a)(1), 841(b)(1)(A)(ii) (1982 & Supp. V 1987) and 18 U.S.C. § 2 (1982). Chapoteau received a fifteen year term of imprisonment on the conspiracy count and three years imprisonment on each of the two substantive counts. The sentences for the substantive counts were to run concurrently with each other and consecutively to the fifteen year conspiracy sentence. In addition to the prison terms, Chapoteau was assessed three concurrent $200,000 fines and ordered to pay a special assessment of $150.

Michael Crown was convicted of one count of conspiracy to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(ii)(II). Crown was sentenced to four years imprisonment and ordered to pay a $50 special assessment.

Pedro DaSilva was convicted of conspiracy to distribute and possess with intent to distribute cocaine and one substantive count each of importing cocaine and possessing cocaine with intent to distribute in violation of 21 U.S.C. §§ 952(a), 960(a)(1), 960(b)(1), 841(a)(1), 841(b)(1)(A)(ii)(II), 846 and 18 U.S.C. § 2. He received concurrent sentences of fifteen years imprisonment on the conspiracy, importation and possession counts. DaSilva also received two concurrent five year special parole terms and was fined $25,000 for each of the substantive importation and possession counts, such fines to run consecutively for a total fine in the amount of $50,000. Additionally, DaSilva was ordered to pay a $150 special assessment.

Steven M. Finn was convicted of one count of conspiracy to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(ii)(II). Finn received a suspended eight year term of imprisonment and was placed on five years probation. He was fined $750,000 and ordered to pay a special assessment in the amount of $50.

On appeal, the parties raise several challenges to their convictions. Chapoteau, DaSilva, Crown and Finn assert that the evidence established multiple conspiracies rather than the single conspiracy of which they were convicted. Chapoteau argues that there was inadequate evidence to convict him of the two substantive offenses of which he was convicted. Crown, DaSilva and Finn contest the sufficiency of the evidence to convict them of the conspiracy count. In addition, Crown contends that the government improperly used a grand jury subpoena to obtain the trial testimony of Brian Rockett. Finn claims that the district court erred in admitting into evidence a computer printout listing his name, address and telephone number.

Oral argument in this case was heard on April 24, 1989. Subsequent to oral argument, the United States Supreme Court decided *Gomez v. United States*, —— U.S. ——, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989), which reversed our earlier decision in *United States v. Garcia*, 848 F.2d 1324 (2d Cir.1988). *Gomez* involved a situation in which the criminal defendants objected to the delegation of jury selection to a magistrate. In *Gomez*, the Supreme Court held that federal magistrates were not authorized under the Federal Magistrates Act, 28 U.S.C. § 631 (1982 & Supp. V 1987), to conduct jury selection in a felony trial. The Court held that in a felony case criminal defendants have a "right to have all critical stages of a criminal trial conducted by a person with jurisdiction to preside [over the entire proceeding]. Thus, harmless-error analysis does not apply in a felony case in which, despite the defendant's objection and without any meaningful review by a district judge, [a magistrate] exceeds his jurisdiction by selecting a jury." *Gomez*, —— U.S. ——, 109 S.Ct. at 2239. In the instant case, the jury was also selected by a magistrate. After oral argument, and in light of the Supreme Court's decision in *Gomez*, the parties sought and were granted permission to file supplemental briefs and appendices and to include additional documents in the record on appeal pursuant to Fed.R.App.P. 10(e). Appellants now contend that *Gomez* requires reversal of their convictions. For the reasons stated *infra*, we disagree.

We find all of the appellants' contentions to be without merit. We therefore affirm the appellants' convictions.

## BACKGROUND

A. *Overview*

Chapoteau, Crown, DaSilva and Finn, along with numerous others, were charged with participating in a conspiracy to import, possess and distribute large quantities of cocaine from Brazil by using the facilities and employees of Pan American World Airways (Pan Am) and Varig Airlines (Varig) over an eight year period. Under one method of importation, Brazilian suppliers would conceal the cocaine in suitcases or packages and relinquish the suitcases or packages to Brazilian airline employees for shipment to John F. Kennedy International Airport (JFK) in New York as unaccompanied luggage. The Brazilian exporters would telephone one of their contacts at JFK and give the contact a code for the baggage claim number of the package containing the cocaine. Upon arrival at JFK, an employee of either Pan Am or Varig, depending on which airline was used for that particular transaction, would intercept and deliver the cocaine. According to a second method of importation, individuals would carry luggage containing cocaine to New York and employees of either Varig or Pan Am would assist them in avoiding detection by United States Customs Service (Customs) officials. The participants at both Pan Am and Varig received $5,000 per kilogram for their efforts.

Evidence at trial showed that Chapoteau introduced Aart Vanwort to the drug importation business and for a time supervised the operations at Pan Am before Vanwort became the central figure in the conspiracy. The other appellants' roles in the conspiracy are similarly well defined. DaSilva was the supervisor of the drug smuggling activities at Varig. He obtained his supply of cocaine from the same Brazilian sources as did Chapoteau and Vanwort. The evidence at trial established that Crown, a former employee of Pan Am, received and distributed substantial amounts of cocaine. Finn concedes that he purchased cocaine from various importers.

We will elaborate on the operation of the conspiracy and the inter-relationship of its various participants.

B. *Chapoteau, Vanwort and Pan Am*

Aart Vanwort testified as a government witness at trial. His testimony established that between 1980 and 1987 he was involved in importing cocaine from Brazil to JFK on approximately twenty occasions. He further testified that Chapoteau first requested his assistance in the importation of cocaine in the summer of 1980. At that time, both Chapoteau and Vanwort were employees of Pan Am at JFK. Chapoteau requested Vanwort's assistance in clearing four boxes, which had been imported from Brazil, through Customs inspection. Chapoteau informed Vanwort that he did not want the boxes to be inspected. However, a Customs inspector did examine two of the boxes. Even though the boxes did contain cocaine, the Customs inspector found only coffee. The boxes were stamped "cleared" and Vanwort and Chapoteau transported them out of the Customs inspection area. Chapoteau then informed Vanwort that the boxes contained cocaine from Brazil and paid Vanwort $5,000 for his assistance. Chapoteau requested Vanwort's assistance on several subsequent occasions, but Vanwort was unavailable. Despite his unavailability, Chapoteau paid Vanwort, assuring him that they were "partners." Vanwort had no involvement in importing cocaine with Chapoteau after September 1980.

In December 1980, Chapoteau introduced Vanwort to Sergio Alcantara. According to Vanwort's testimony, Alcantara stated that "he d[id]n't like to really work with Chapoteau anymore and had great interest in working with [Vanwort]." Vanwort subsequently agreed to meet with Alcantara and Eduardo Varitzo. At that meeting, Vanwort was accompanied by Ivory Hobson. Alcantara and Varitzo indicated their desire to use Vanwort in the importation scheme. Vanwort testified that his and Hobson's first importation of cocaine for Alcantara and Varitzo occurred in the lat-

ter part of 1981. Alcantara called Vanwort from Brazil and told him that he had "a new telephone number." The number was actually the baggage claim number of a suitcase containing cocaine that Alcantara had placed on a Pan Am flight bound for JFK. Vanwort contacted Hobson, who retrieved the suitcase and took it past the Customs inspection area. Vanwort later delivered the suitcase to Alcantara. Vanwort and Hobson thereafter had several disputes, and Vanwort turned to Vincent Cicali for help. Vanwort and Cicali worked together importing cocaine during 1982.

Vanwort met several of the key Brazilians who were involved in the drug operation during a trip to Brazil in 1982. While there, he met Pan Am employee Walter Cabral, who assisted in loading packages of cocaine for transport to the United States. Cabral testified that he assisted in numerous importations involving both Chapoteau and Vanwort. Also in 1982, Vanwort met Molina, the Brazilian who was the source of the cocaine. Molina had been using Alcantara and Varitzo to import cocaine, but became dissatisfied because of the high price he had to pay for their assistance. He asked Vanwort to work directly for him, and Vanwort agreed.

On one occasion, one of the bags containing cocaine that Molina was supposed to export for Vanwort arrived late. When the bag finally arrived, Cicali and Vanwort took it to a New York City hotel room where they inspected it and found that approximately four kilograms of cocaine were missing. The bag was eventually retrieved by Hobson, who delivered it to Vanwort's custody. In a tape-recorded conversation between Chapoteau and Hobson, Chapoteau indicated that he believed this incident reflected poorly on him because he had introduced Vanwort to the business. Chapoteau also expressed his suspicion that Vanwort had stolen the cocaine.

## C. *The Varig Operation*

Pedro DaSilva was Vanwort's "counterpart" at Varig. According to Vanwort's testimony, Alcantara made several references to a "Pedro" who worked at Varig and was involved in similar cocaine transactions. Alexander Fontenelle pled guilty and testified pursuant to a plea agreement. Fontenelle testified that both he and Carlos Villela were involved in importing cocaine from Brazil via Varig and DaSilva. On one occasion when Fontenelle wished to import cocaine, he contacted Villela who contacted DaSilva. DaSilva then aided Fontenelle in getting the cocaine into New York. In addition, other drug dealers with whom Fontenelle was involved in Brazil told him that they sent cocaine through DaSilva. Fontenelle further testified that on several occasions, he sold large quantities (over one kilogram) of imported cocaine to Steven M. Finn in Boston, Massachusetts. Villela testified that he had used DaSilva's services in importing cocaine several times earlier in 1982. Villela also testified that DaSilva introduced him to Rubens DaCosta, a Varig employee who subsequently became involved in the distribution of cocaine.

## D. *Michael Zacharias*

In 1982, Michael Zacharias met with Vanwort to discuss Vanwort's working for Zacharias in the drug importing business. At trial, Vanwort described Zacharias as a "broker" who could use his many contacts to arrange the transportation of cocaine from Brazil to New York. Zacharias orchestrated an importation scheme in May 1983 using Pan Am and Vanwort. Vanwort collected a bag containing cocaine from Zacharias in Rio de Janeiro, and gave it to Cabral. Cabral then saw to it that the bag was on the same flight that Vanwort and Hobson took back to New York. Vanwort received the cocaine in New York from Cicali, who brought it to him in a parking lot. Vanwort then delivered it to Fontenelle and one Mario Rocha. Rocha had been identified by Zacharias as the source of the cocaine. Fontenelle subsequently sold some of the cocaine to Finn. In another transaction shortly thereafter Zacharias also acted as a broker. That transaction involved the importation of cocaine by Vanwort, Hobson, Cicali, Duignan, Fontenelle and Finn. In this transaction, Fontenelle sold 2.5 kilograms of the cocaine

and stored another one-half kilogram at Finn's home in Boston. Finn subsequently purchased one-half of the remainder.

### E. *Problems with the Varig Operation*

Although Villela had been dealing with DaSilva at Varig, in the fall of 1983 he encountered some difficulty reaching Da-Silva on several occasions when he wished to schedule a drug transaction. Mario Rocha informed Villela that Vanwort at Pan Am would be able to accommodate him. Consequently, several transactions were arranged and completed in which Villela used Vanwort and Pan Am.

DaSilva was forced to curtail his operations at Varig because of the December 1983 arrest of two Brazilian women at JFK possessing two kilograms of cocaine and DaSilva's business card. To escape possible detection and arrest, DaSilva left New York and settled in Miami, Florida.

Villela testified that DaSilva informed him that he had a "partner" at Pan Am who could help "if he—Pedro, ... [could not] do the job." Thus, Pan Am became the main importation route.

### F. *The Chapoteau Tapes*

On January 21, 1986, in an incident unrelated to the conspiracy, Ivory Hobson, a former participant in the conspiracy, was arrested and charged with possession of cocaine. Hobson agreed to cooperate with Drug Enforcement Agency (DEA) officials, disclosed his participation in the conspiracy, and agreed to approach his former co-conspirators. A March 28, 1986 conversation between Ivory Hobson and Chapoteau depicting the operation of the conspiracy was tape recorded and the tape was introduced into evidence at the trial. During the conversation, Chapoteau stated several times that he was the one who introduced Aart Vanwort into the business. Regarding the distribution chain, Chapoteau recounted that "Molina is the ... man who gives to Michael [Zacharias], who gives to Sergio [Alcantara], who gives to ... Eduardo

[Varitzo] and everybody." Several other taped conversations between Chapoteau and Hobson further illustrate the operation of the conspiracy and the complicity of the appellants.

### G. *The Last Importations*

In December 1986 and January 1987, Vanwort entered into negotiations with Claudio Petenucci, a Brazilian cocaine manufacturer and distributor, concerning the importation of cocaine for Petenucci. On February 7 and 28, 1987, Vanwort, his brother Christianus, Cicali and Duignan conducted what would be the last of the importations using Pan Am.

### H. *The Arrests*

Aart and Christianus Vanwort were arrested on March 2, 1987 in a New York City hotel. Police seized approximately $85,000 in cash and one ounce of cocaine from Vanwort's hotel room safe. A search of Vanwort's safe deposit box at the Zurich Deposit Box Corporation under the alias of "Tony Stolk" yielded an additional $295,-000. The other defendants were arrested over the following few days. When Chapoteau was arrested, a search of his residence produced telephone numbers for Cicali, Zacharias and a Brazilian cocaine dealer named "Tony." When arrested, DaSilva had in his possession an unused Varig airline ticket for "Mar[ ]io Rocha," an uncashed check from Carlos Villela and the telephone numbers of various cocaine traffickers. Cicali's safe deposit box, listed under the alias "V. Leone" turned up $32,-000 in cash and evidence of $35,000 in loans that were owed to him.

Finn was arrested in Boston after discussing with an undercover agent the possibility of starting a cocaine "franchise" in Boston and attempting to collect part of the debt that Fontenelle owed him.

Chapoteau, Crown, DaSilva, Finn and several others were named in a Superseding Indictment [2] and charged with conspiracy to distribute and possess with intent to

---

**2.** The appellants were convicted of charges that appeared in the third Superseding Indictment. The original indictment and two subsequent su-

perseding indictments differed from the third in that they named several more individual parties and contained fewer counts.

distribute large quantities of cocaine. Da-Silva and Chapoteau were also charged with substantive counts of importation and possession with intent to distribute large amounts of cocaine.

## I. *District Court Proceedings*

Appellants were tried in a joint trial which lasted eight weeks. Each appellant made several motions for a severance pursuant to Fed.R.Crim.P. 14. They argued that several conspiracies existed, rather than the one conspiracy charged in the indictment and that if a severance were not granted, they would be prejudiced by the spillover of evidence. The district court denied these motions and proceeded to try the defendants in one trial.

After the government and the parties rested their cases, the district court instructed the jury that to convict the defendants of the conspiracy charged in Count One of the Superseding Indictment, they had to find that a single conspiracy, rather than multiple conspiracies, existed. The district court specifically stated that "[p]roof of several separate and independent conspiracies is not proof of the single overall conspiracy charged in the indictment." The district court went on to describe the differences between a single conspiracy and multiple conspiracies and to specify what evidence would be required to find a single conspiracy. The jury found that one conspiracy existed and the appellants were convicted of all of the charges against them found in the Superseding Indictment.

Appellants now appeal their convictions, contending, *inter alia*, that the district court erred in not granting their motions for severance, that they were prejudiced by the spillover effect of evidence introduced only against some defendants and that the evidence established several conspiracies rather than the one charged. Chapoteau contends that the evidence was insufficient to convict him of the two substantive offenses with which he was charged. Crown, DaSilva and Finn challenge the sufficiency of the evidence to convict them of the conspiracy count. Crown also claims that the government improperly used a grand jury subpoena to obtain the trial testimony of Brian Rockett. Finn argues that the district court erred in admitting a computer printout from a disk found in Petenucci's office listing his name, address and telephone number. For the following reasons, we disagree with all the appellants' arguments and affirm their convictions.

## DISCUSSION

■ We first address appellants' argument that their convictions should be reversed because jury selection was conducted by a federal magistrate, not an Article III judge having jurisdiction to preside over the entire proceeding. We recently addressed the same issue in *United States v. Wong*, 884 F.2d 1537 (2d Cir.1989), *petition for rehearing denied, id.* at 1544. In denying Wong's petition for rehearing, we determined that *Gomez* did not require a reversal because Wong had consented to the magistrate's conduct of the *voir dire*.[3] In analyzing *Gomez*, we noted that the Supreme Court "limited its ruling to the situation in which a magistrate selects a jury 'despite the defendant's objection.'" *Wong, id.* at 1545 (quoting *Gomez*, —— U.S. at ——, 109 S.Ct. at 2239). We also observed that in *Gomez*, "[t]he Court introduced its opinion ... with the statement that '[t]he principal question presented is whether [a magistrate's] presiding at the selection of a jury in a felony trial *without the defendant's consent*' is authorized by the Federal Magistrates Act." *Id.* (emphasis added by *Wong* panel) (quoting *Gomez*, —— U.S. at ——, 109 S.Ct. at 2240). We denied Wong's petition for rehearing, concluding that because he had not only failed to object but had explicitly consented to the magistrate's selection of the jury, reversal was not required. *Id.* Similarly, in this case, there was no objection to the magis-

3. Our original opinion in *Wong* rejected the argument that the selection of the jury by a magistrate required a reversal of his conviction. Then *Gomez* was decided, holding that federal magistrates are not authorized to conduct jury selection in a felony trial. Wong's petition for rehearing in light of *Gomez* followed.

trate's selecting the jury. Given this failure to object, we conclude that jury selection by the magistrate does not necessitate the reversal of the appellants' convictions here. *Id.* We now address the appellants' other arguments.

Appellants' arguments that the evidence proved multiple conspiracies rather than a single conspiracy and that their motions for severance should have been granted are virtually identical. We find these arguments to be meritless.

### A. *Single v. Multiple Conspiracies*

■ " 'Whether the evidence in a case establishes single or multiple conspiracies is a question of fact to be resolved by a properly instructed jury.' " *United States v. Nerlinger*, 862 F.2d 967, 972 (2d Cir. 1988) (quoting *United States v. Friedman*, 854 F.2d 535, 561 (2d Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989)). Appellants do not challenge the propriety of the jury instructions, but contend that the evidence was insufficient to support the jury's finding of a single conspiracy. In assessing the sufficiency of the government's evidence, " 'we must view the evidence in the light most favorable to the government, ... and construe all permissible inferences in its favor.' " *United States v. Heinemann*, 801 F.2d 86, 91 (2d Cir.1986) (quoting *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.) (citations omitted), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2457, 77 L.Ed.2d 1335 (1983)), *cert. denied,* 479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987). We hold that the evidence was sufficient to support the jury's finding.

A single conspiracy may be found where there is " 'mutual dependence and assistance' among the [participants], a common aim or purpose ... or a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture." *United States v. Bertolotti*, 529 F.2d 149, 154 (2d Cir.1975) (citation omitted) (quoting *United States v. Tramunti*, 513 F.2d 1087, 1106

(2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975)). All that needs to be proved is that " 'it reasonably could be inferred that [the appellants] participated in the alleged enterprise with a consciousness of its general nature and extent.' " *United States v. Rooney*, 866 F.2d 28, 32 (2d Cir.1989) (quoting *United States v. Alessi*, 638 F.2d 466, 473 (2d Cir.1980)). The members of the conspiracy do not have to "conspire directly with every other member of it, or be aware of all acts committed in furtherance of the conspiracy, or even know every other member." *Id.* (citations omitted). There is no requirement that the same people be involved throughout the duration of the conspiracy. *See id.* Furthermore, "a single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis in its locale of operations." *United States v. Cambindo Valencia*, 609 F.2d 603, 625 (2d Cir.1979), *modified on rehearing,* 609 F.2d 603, 641 (2d Cir.), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980).

In the present case, the evidence indicated " 'mutual dependence and assistance.' " *Bertolotti*, 529 F.2d at 154 (quoting *Tramunti*, 513 F.2d at 1106). Chapoteau was responsible for Vanwort's introduction to the cocaine importation world. The two ultimately operated separate "businesses;" however, such shifts are not uncommon in long-lasting conspiracies. *See Heinemann*, 801 F.2d at 92. Chapoteau and Vanwort shared the same sources in Brazil. There was also some overlap in personnel, such as Cabral in Brazil and Vincent Cicali in New York City. Chapoteau and Vanwort may not have worked together, but they did cooperate with each other in what seemed to be an open working relationship. (*E.g.,* Chapoteau's statement: "You do business with him, fine. You come next time you do business with me, fine.") Also, as indicated *supra,* DaSilva had a "partner" at Pan Am. Presumably, this partner was Chapoteau. Thus there was ample evidence of mutual dependence and assistance.

Regarding the "common aim or purpose," *Bertolotti*, 529 F.2d at 154, the facts

established at trial proved the existence of one conspiracy in which cocaine was transported from Brazil to the United States via JFK using employees of both Pan Am and Varig and distributed to various sources in the United States. The Brazilian traffickers used the two spheres interchangeably. Chapoteau, Vanwort and DaSilva performed the same services using the same methods for the same group of Brazilian exporters: Molina, Zacharias, Alcantara, Varitzo and Petenucci. *See supra.* The participants thus shared "a common aim or purpose," *Bertolotti,* 529 F.2d at 154, of importing the Brazilian cocaine.

Although the operations at Pan Am and at Varig were physically separate and were staffed by different people, each member was "aware of his part in a larger organization." *Id.* Chapoteau introduced Vanwort to the importation scheme and was aware of Vanwort's continuing importation activities. The members of each group were well aware of the existence of others who were involved in the same operation. In fact, as previously noted, DaSilva considered Vanwort to be his counterpart at Pan Am. The American distributors—Finn and Crown—were also aware that the cocaine they obtained was imported via the airport operations. *See infra.*

In sum, the evidence was more than sufficient to support the jury's finding that a single conspiracy existed.

## B. *Joint Trial*

■ As shown *supra,* there was sufficient evidence to show that the defendants were involved in a single conspiracy. The conspiracy count therefore was "non-frivolous" and joinder under Fed.R.Crim.P. 8(b) was proper. *Nerlinger,* 862 F.2d at 973. The evidence shows that all the parties were involved, albeit at various times and to varying degrees, in the same plan to import and distribute cocaine. Hence, judicial economy was served by the joinder. *See id.*

Rule 14 of the Federal Rules of Criminal Procedure enables a district court to grant a severance of defendants if it appears that a defendant will be prejudiced by a joinder.

"Motions to sever under Rule 14 are committed to the sound discretion of the trial judge, and a denial of such a motion will be reversed only upon a showing of clear abuse of that discretion." *United States v. Chang An–Lo,* 851 F.2d 547, 556 (2d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988). To overturn a denial of a motion to sever, " '[t]he burden is upon a moving defendant to show facts demonstrating that he will be so severely prejudiced by a joint trial that it would in effect deny him a fair trial. The defendant must demonstrate that he suffered such prejudice as a result of the joinder.' " *United States v. Burke,* 700 F.2d 70, 83 (2d Cir.) (quoting *United States v. Rucker,* 586 F.2d 899, 902 (2d Cir.1978)), *cert. denied,* 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983). There being ample evidence of a single conspiracy, we find no abuse of discretion here in the district court's denial of the appellants' motions to sever.

Appellants claim that they were prejudiced by the spillover of evidence concerning the other defendants in the trial and that such evidence would not have been admitted in a separate trial. "A defendant raising a claim of prejudicial spillover bears an extremely heavy burden." *Friedman,* 854 F.2d at 563. A defendant raising such a claim "must show that he or she suffered prejudice so substantial as to amount to a 'miscarriage of justice.' " *Id.* (quoting *United States v. Bari,* 750 F.2d 1169, 1177 (2d Cir.1984), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985)). Appellants fail to carry that burden here.

The proof against Chapoteau, both from his own tape-recorded admissions and from the testimony of others, conclusively established his involvement in the conspiracy. The evidence regarding DaSilva's participation was overwhelming. DaSilva was the focus of much of the trial testimony of Vanwort, Hobson, Fontenelle and Villela. This evidence could have been elicited at a separate trial, however it was more judicially efficient to hold one trial of the several defendants. DaSilva's prejudicial spillover argument thus must fail. As will be shown *infra,* there was more than enough

independent evidence of both Crown's and Finn's complicity to link them to the conspiracy. Likewise, their claims of prejudice are fatally flawed.

## C. *Sufficiency of the Evidence*

■ The appellants all challenge the sufficiency of the evidence to support their convictions. In this regard, we note our recent reiteration that when a defendant is challenging the sufficiency of the evidence, "a verdict 'must be sustained if there is substantial evidence ... to support it.'" *United States v. Zabare*, 871 F.2d 282, 286 (2d Cir.1989) (quoting *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)). A reviewing court must view the evidence "'in the light most favorable to the government,' and ... draw all reasonable inferences and resolve all issues of credibility in favor of the verdict." *Id.* (quoting *United States v. Martino*, 759 F.2d 998, 1002 (2d Cir.1985)). Convictions must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The evidence here was sufficient to support all the convictions.

## D. *Individual Appellant's Arguments*

### 1. *Jeanmarie Chapoteau*

■ Chapoteau contends that the evidence showed multiple conspiracies rather than a single conspiracy. As shown *supra*, this contention must fail. Chapoteau argues additionally that the evidence was insufficient to support his conviction on the substantive counts of importation and attempting to possess cocaine with the intent to distribute it. This argument also lacks merit.

DEA Special Agent Peter Mitesser testified that he participated in a May 5, 1986 seizure of thirty kilograms of cocaine that had arrived at JFK on a Pan Am flight that originated in Brazil. According to Chapoteau's own admissions in the March 28 taped conversation with Hobson, he had recently been to Brazil and met with Zacharias concerning an impending importation

of cocaine. The tape-recorded conversations also revealed that Zacharias and Chapoteau were maintaining their business relationship in 1986. A May 26, 1986 recorded conversation between Chapoteau and Hobson illustrated that Chapoteau was familiar with the details of the importation, seizure and Zacharias' role as the source of the cocaine. Also, Chapoteau was working at the airport on the day of the importation. When Chapoteau was arrested, he possessed Zacharias' phone number. These facts support a conclusion that Chapoteau was the likely channel through which Zacharias would import drugs into JFK.

Viewing the evidence in the light most favorable to the government, there was sufficient evidence to support the jury's verdict that Chapoteau was guilty of the substantive counts of importation and attempting to possess cocaine with the intent to distribute it. We therefore uphold his conviction on those counts.

### 2. *Michael Crown*

#### a. Sufficiency of Evidence

■ Crown contends that the district court erred in denying his motion for judgment of acquittal in view of the prosecution's failure to present sufficient evidence of his involvement in the conspiracy. This contention is meritless.

Crown's concessions are sufficient to support his conspiracy conviction. He acknowledges that, when the evidence is viewed in the light most favorable to the government, he was "chargeable with knowing that Vanwort was involved in smuggling drugs and with the receipt of some cocaine from Vanwort on a total of three occasions which cocaine [he] in turn sold to ... Brian Rockett." (citations omitted). He also states that "[b]ased on Rockett's testimony [he] is chargeable with having at least a general awareness that Brazil was the source of the drugs and that the contraband was getting through customs via Pan Am Airways at Kennedy Airport."

Rockett's testimony is replete with examples of Crown's selling cocaine to him over

several years. The record also indicates that Crown explained the workings of the importation scheme to Rockett and suggested that he (Rockett) could become involved if he so desired. The evidence also indicates that Crown helped facilitate a deal in which Vanwort sold some cocaine that originated from Claudio Petenucci to one Richard Keim. Additionally, there is evidence that Crown agreed to help Vanwort transport some of his illegally gained profits to Europe.

A court authorized wiretap was installed on Crown's home telephone. Tapes of conversations indicated that Crown was about to relinquish a safe deposit box that he had been maintaining under an assumed name. The safe deposit box was at the same location at which Cicali and Vanwort maintained boxes. The tapes also revealed that Crown was reluctant to talk on the telephone for fear that the scheme would be uncovered.

Evidence must be viewed as a whole rather than in isolation and on appellate review all reasonable inferences must be drawn in favor of the prosecution. *United States v. Khan,* 787 F.2d 28, 34 (2d Cir. 1986); *United States v. Young,* 745 F.2d 733, 762 (2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). In addition, we have noted that " 'once a conspiracy is shown, only slight evidence is needed to link another defendant with it.' " *United States v. Wilkinson,* 754 F.2d 1427, 1436 (2d Cir.) (quoting *United States v. Marrapese,* 486 F.2d 918, 921 (2d Cir.1973), *cert. denied,* 415 U.S. 994, 94 S.Ct. 1597, 39 L.Ed.2d 891 (1974)), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). Viewing all the evidence of Crown's involvement in the conspiracy, it was sufficient to support the jury's verdict.

■ Confronted with this evidence, Crown claims that his role was too minor to justify the conspiracy conviction. This argument is untenable. The size of a defendant's role does not determine whether that person may be convicted of conspiracy charges. Rather, what is important is whether the defendant willfully partici-

pated in the activities of the conspiracy with knowledge of its illegal ends. *See Rooney,* 866 F.2d at 32; *Alessi,* 638 F.2d at 473. That Crown only received cocaine from Vanwort on three occasions and characterized himself as "a minor, bit player" who received "leftover" cocaine is of no significance. In *Zabare,* we restated our position that "a defendant's participation in a single transaction can suffice to sustain a charge of knowing participation in an existing conspiracy." *Zabare,* 871 F.2d at 287. Hence, if a single transaction can justify a conspiracy conviction, there is no doubt that evidence of three transactions constitutes more than ample proof of involvement in a conspiracy. Accordingly, in light of the foregoing, we hold that Crown's conviction on the conspiracy count must stand.

### b. Use of Grand Jury Subpoena to Obtain Rockett's Testimony

■ Crown alleges that the prosecutor improperly issued a grand jury subpoena to obtain the trial testimony of Brian Rockett and that he was so prejudiced by this that his conviction must be overturned. We disagree.

The district court requested that the government "submit [its] appropriate affidavits" to show that its use of the grand jury subpoena was proper. The government's affidavit stated that it was seeking Rockett "to elicit specific dates concerning Michael Crown's receipt of ½ kilo and kilo quantities of cocaine from Aart Vanwort on a number of occasions." The government "hoped to add substantive 21 U.S.C. § 841 counts against Crown in a superseding indictment, as [it] had done with every other defendant in this case, except for Steven Finn." The affidavit stated that in November 1987, the government authorized the issuance of a grand jury subpoena to obtain Rockett's testimony. The subpoena issued had a return date of January 15, 1988. Rockett's whereabouts were not determined until early January 1988. The subpoena was at that time left with Rockett's fiancee. Because of Rockett's unavailability on January 15, the return date

was adjourned for several days. On approximately January 14, 1988, Rockett voluntarily visited the Assistant United States Attorney's (AUSA) office. During that visit, he did not mention the grand jury subpoena. The government's affidavit also recounted Rockett's statement that his fiancee had not been served with the subpoena. The government's affidavit also stated that the government was unable to produce a copy of the subpoena. The government noted the impracticality of seeking a superseding indictment due to Rockett's limited ability to provide precise dates of his narcotics involvement with Crown and the imminence of the trial by the time Rockett had been located. The government never presented Rockett's testimony to the grand jury.

It is clearly " 'improper to utilize a Grand Jury for the sole or dominating purpose of preparing an already pending indictment for trial.' " *Payden v. United States (In re Grand Jury Subpoena Duces Tecum Dated January 2, 1985 (Simels) )*, 767 F.2d 26, 29 (2d Cir.1985) (quoting *United States v. Dardi*, 330 F.2d 316, 336 (2d Cir.), *cert. denied*, 379 U.S. 845, 869, 85 S.Ct. 50, 51, 117, 13 L.Ed.2d 50, 73 (1964)). There was no improper use of the grand jury subpoena in the instant case. The government's reason for directing the issuance of the subpoena was a valid one. The subpoena was authorized in November 1987, prior to the return of the last superseding indictment in December 1987. Additionally, Crown was not arraigned on the last superseding indictment until January 28, 1988, which was after the original return date of the subpoena. Thus, there is no justification for an argument that the subpoena was used to prepare an already pending case for trial.

Service of the grand jury subpoena in no way prejudiced Crown. As previously noted, Rockett never testified before a grand jury. Rockett's decision to cooperate with the government and to testify at trial was more likely prompted by his own self-interest. The process of arresting the conspirators had begun; Rockett's fiancee had told an East Hampton, New York police officer about Rockett's involvement with Crown; and there was a chance that Crown would give testimony implicating Rockett. On cross-examination, Rockett admitted that when he went to the AUSA's office "I had determined at that point that I felt there was enough against me as to what had transpired, what had been said that I was going to cooperate and not push it any further."

The record indicates no evidence of an abuse of the grand jury process. The subpoena was issued for a proper purpose. Rockett's testimony did not unduly prejudice Crown. There was sufficient evidence of Crown's participation in the conspiracy to convict him on the conspiracy count. Accordingly, his conviction on the conspiracy count must be upheld.

### 3. *Pedro DaSilva*

■ DaSilva contends that there were at least two separate conspiracies involving the importation of cocaine into the United States from Brazil via the employees of Pan Am and Varig. As noted *supra*, the evidence was sufficient to support a finding of a single conspiracy. Based on, among other things, the reported testimony of Carlos Villela, the jury found that DaSilva had participated in the single conspiracy.

Given the number of people with whom DaSilva was involved in cocaine trafficking, there was sufficient proof that DaSilva had knowledge of the existence of the conspiracy to import cocaine. Even if DaSilva were only aware of the acts concerning Varig, there is no requirement that he be aware of all of the acts of the others in furtherance of the conspiracy. *See Rooney*, 866 F.2d at 32; *Alessi*, 638 F.2d at 473. Thus, viewing the evidence in the light most favorable to the government, the jury's verdict that DaSilva was involved as a co-conspirator in the single conspiracy was justified and will not be overturned. The district court properly denied his Motion for Judgment of Acquittal, or in the alternative, Motion for New Trial.

### 4. *Steven Finn*

Finn argues that there were multiple conspiracies rather than a single conspiracy, and that if a single conspiracy were found, the evidence was insufficient to

prove that he voluntarily participated in it or that there was mutual dependence and assistance among the spheres. Further, Finn contends that the district court committed reversible error in permitting testimony concerning the presence of his name, address and telephone number on a computer disk found in the search of Claudio Petenucci's office in Brazil. These arguments are without merit.

◼ The evidence was sufficient to establish a single conspiracy. *See supra.* Finn's claim that the evidence of his participation was insufficient to support his conviction must fail. The evidence presented at trial showed that Finn was aware of the importation methods, lent $25,000 to Fontenelle to enable him to purchase cocaine knowing that Fontenelle would not use $25,000 worth of cocaine for personal consumption but would distribute it and met Petenucci and gave him his phone number (which was later found on the computer disk). Thus there was sufficient evidence to show Finn's participation.

Like Crown, Finn characterizes himself as a "minor, bit player" in the conspiracy. This characterization is of no consequence to the conspiracy conviction. As we said in response to Crown's similar claim, *see supra*, the size of a co-conspirator's role is not a determinative factor. Rather, what is important is "the qualitative nature of the act or acts ... in the context of the entire conspiracy," *United States v. Torres*, 503 F.2d 1120, 1124 (2d Cir.1974), which is determinative. That Finn knowingly and willingly committed acts in furtherance of the conspiracy was adequately shown by the evidence developed at trial.

◼ The computer printout from the disk obtained from Petenucci's office contained Finn's name and address along with a list of the names and addresses of the other conspirators. It also contained an accounting ledger depicting several drug transactions. Finn objects to the admission of the printout on the grounds that the government failed to lay a proper foundation for its admission and that it was of questionable probative value. Although Finn raises these two objections, the crux of his argument is that the printout is of questionable relevance and probative value

and is prejudicial to his case. *See* Fed.R. Evid. 401, 403. We disagree and hold that the district court properly admitted the printout.

Determinations of relevance are committed to the sound discretion of the district court and will not be overturned unless the judge acted "arbitrarily or irrationally." *United States v. Cruz*, 797 F.2d 90, 95 (2d Cir.1986). The district court's actions here were neither arbitrary nor irrational. The printout illustrated Petenucci's connection to Finn and the other conspirators. It is analogous to a conspirator's address book, which we have found to be admissible to prove association and knowledge in drug conspiracy cases. *See, e.g., United States v. Jaramillo–Montoya*, 834 F.2d 276, 278–79 (2d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1998, 100 L.Ed.2d 229 (1988) (address book admissible as co-conspirator statement under Fed.R.Evid. 801(d)(2)(E)). Concerning its probative value and possible prejudicial effect, the evidence was probative of Finn's involvement in the conspiracy. In light of the other evidence of Finn's participation, it was not unduly prejudicial. Thus, it was properly admitted.

### CONCLUSION

The judgments of conviction of all appellants are hereby affirmed.