Case No. 96-4369 vacated and remanded by Supreme Court order filed 10/2/00.

Case No. 96-4459 vacated and remanded by Supreme Court order filed 10/2/00.

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 96-4227

WILLIAM GIBSON, SR.,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.
                                                           No. 96-4368
DARNELL JAMES COOK, a/k/a
Gingerbread,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.
                                                           No. 96-4369
BERNARD GIBSON, SR., a/k/a Bernard
Willis,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 96-4459

MARSTON EDWARD BLUE,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 96-4460

GERALD LEE CASHWELL, a/k/a Cash,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 96-4631

LEVANDER JOHNSON,
Defendant-Appellant.

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CR-94-454-PJM)

Argued: May 6, 1999

Decided: July 27, 1999

Before MURNAGHAN, WILLIAMS, and MICHAEL,
Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Gary Allen Ticknor, Baltimore, Maryland; Jonathan Seth
Zucker, Washington, D.C.; Elmer Robert Keach, III, Rensselaer, New

2

York, for Appellants. Jan Paul Miller, Assistant United States Attorney, Sandra Wilkinson, Assistant United States Attorney, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Michelle Roberts, ROCHON & ROBERTS, Washington, D.C., for Appellant Cashwell; Michael D. Montemarano, Baltimore, Maryland, for Appellant Bernard Gibson; Robert Hale, Assistant Federal Public Defender, Baltimore, Maryland, for Appellant Blue. Lynne A. Battaglia, United States Attorney, Greenbelt, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Bernard Gibson, Sr. ("Gibson"), William Gibson, Sr. ("William Gibson"), Marston Blue, Levander Johnson, Darnell Cook, and Gerald Cashwell were convicted in the District of Maryland for conspiracy to possess with intent to distribute heroin and cocaine. Three of these defendants were also convicted of related crimes. All six appeal their convictions on a number of grounds, and we affirm.

I.

According to the government's theory of the case, Gibson was the leader of a substantial and long-standing drug conspiracy; Blue and William Gibson were his primary assistants and helped store, test, and distribute the drugs; and Cook, Cashwell, and Johnson were primarily involved in street-level distribution.

The defendants were tried jointly, and the government used three kinds of evidence to prove their roles in the conspiracy. First, the government introduced transcripts of 163 of the defendants' telephone calls intercepted by authorized wiretap. In the calls the defendants discussed the condition of the drugs ("real dark brown"), preparation

3

of the drugs ("if you take, ah, the thing and do it where it's supposed to be done, like you put, you gonna blend your sodas in with a blender"), testing of the drugs ("Yeah, I looked at it, but I kept getting different readings"), and the timing of drug shipments ("I know one is coming, supposed to come on tomorrow or Saturday"). The defendants also discussed and planned actual transactions ("I'm going to get you charlie and . . . I have a lot of helen . . . so we gonna get, I'm gonna go, go take care of that for you right now"). The defendants used coded language to avoid referring to drugs by name. See, e.g., JA 1790, 1798, SJA 28 (using "helen" and "charlie" as code words for heroin and cocaine), JA 556 (describing the use of "200 cattle" as code for 200 kilos of cocaine).

Second, the government offered the testimony of several cooperating witnesses, Michael Lancaster, Victor Jaramillo, Lisa Gonzalez, and William Dupont. These witnesses described their own roles in the conspiracy and their dealings with the defendants. They also elaborated on the government's 163 surveillance tapes by identifying voices, explaining coded language, and placing the taped conversations in the context of actual transactions.

Third, the government introduced, through the testimony of agents, physical evidence seized from the defendants' homes. There, agents found guns, ziploc baggies, scales, large quantities of cash, fake IDs, razor blades, and assorted drug paraphernalia. In Blue and Cook's homes agents also found quantities of heroin. Crack cocaine was found in Johnson's home.

Each defendant was convicted of conspiracy to possess with intent to distribute heroin and cocaine in violation of 21 U.S.C. § 846 (1994). Three defendants were convicted of additional crimes. William Gibson and Blue were each convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (1994). Blue was also convicted of using and carrying a firearm in connection with a drug trafficking crime in violation of 18 U.S.C. § 924(c) (1994) and possession of heroin with intent to distribute in violation of 21 U.S.C. § 841 (1994). Finally, Johnson was convicted of possession of a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k) (1994) and possession of cocaine base with intent to distrib-

4

ute in violation of 21 U.S.C. § 841 (1994). The defendants received sentences ranging from 188 months to life imprisonment.

The defendants raise several arguments on appeal. All six defendants contend that the district court erred by (1) excluding twenty wiretap surveillance tapes offered into evidence by the defendants, (2) refusing to instruct the jury on the law of multiple conspiracies, (3) failing to require the government to produce certain FBI 302 reports, (4) denying the defendants the opportunity to recross-examine government witnesses, and (5) allowing one witness, Lancaster, to testify about acts that occurred prior to the starting date of the conspiracy as alleged in the indictment. The defendants also (6) assert that the indictment was defective because it contained two charges (conspiracy and forfeiture) in one count and (7) raise a "Singleton claim" under 18 U.S.C. § 201(c)(2) and United States v. Singleton, 144 F.3d 1343 (10th Cir. 1998), superseded en banc, 165 F.3d 1297 (10th Cir. 1999), cert. denied, 1999 WL 185874 (U.S. June 21, 1999) (No. 98-8758). In addition, Cook and Cashwell contend that the evidence was insufficient to support their convictions; Cook maintains that he was improperly denied his right to substitute counsel; and Blue, Cook, and Gibson argue that the prosecution engaged in misconduct in closing argument.

The defendants also raise several sentencing issues. Cook, Cashwell, and Johnson argue that the district court attributed improper drug quantities to them in calculating their sentences. Johnson also contends that he did not deserve a two-point enhancement for possession of a firearm. Cashwell contends that he was entitled to a mandatory downward departure from the sentencing guidelines. Finally, Gibson and Blue believe the district court improperly imposed a statutory minimum sentence and certain enhancements based on their status as repeat offenders.

We now address these issues.

II.

After the government introduced its 163 surveillance tapes into evidence, the defendants asked the district court to admit the tapes of twenty additional intercepted conversations which, they contended,

5

would refute the government's theory of the case. The defendants argue that the court violated their Sixth Amendment right to present a defense by excluding the twenty tapes.

The defendants' explanation of how the additional tapes would refute the government's theory is interesting. On the tapes proffered by the defendants, callers used a different code language than that used by callers on the tapes introduced by the government. Where callers on the government's tapes used "helen" and "charlie" as code words for heroin and cocaine, the callers on the defendants' tapes referred to chickens, jackets, pizza, TVs, tires, little cakes, and a plethora of other mundane products sold legally every day. The defendants contend that their tapes would have cast doubt on the government's theory that there was a drug conspiracy because the tapes suggest either (1) that the defendants actually were trafficking in chickens, jackets, pizza, etc. or (2) that there was no understandable code in the first place.

The district court concluded that the defendants' tapes were irrelevant because they did not contradict the government's theory of the case or otherwise meet the government's evidence. We agree. The most straightforward interpretation of the twenty additional tapes is that the relevant conspiracy had at least one additional supplier of drugs who used a different code. As the inculpatory tapes and other evidence introduced by the government make clear, the defendants conspired with each other to distribute drugs, regardless of whether there was an additional supplier who did not use the "helen-charlie" code. Moreover, even if the additional tapes did not concern drugs, but dealt instead with chickens, jackets, pizza, etc., that does not negate what was established by the admitted tapes (and the testimony explaining them).

A defendant, of course, does have a "fundamental constitutional right to a fair opportunity to present a defense," Crane v. Kentucky, 476 U.S. 683, 687 (1986), see also Washington v. Texas, 388 U.S. 14, 19 (1967) (noting that a defendant's "right to present his own witnesses to establish a defense . . . is a fundamental element of due process of law"), but that right was not abridged by the district court's exclusion of the additional tapes. That ruling was within the court's discretion.

6

III.

The defendants next argue that the district court erred in refusing to give a jury instruction on multiple conspiracies. The defendants were charged with a single conspiracy whose purpose was to distribute illegal drugs. Single conspiracies exist when the conspiring group "ha[s] the same objective, . . . the same goal, the same nature, the same geographic spread, the same results, and the same product." United States v. Crockett, 813 F.2d 1310, 1317 (4th Cir. 1987). The defendants argued at trial that the government did not prove a single conspiracy, but instead showed only "the existence of several distinct and unrelated conspiracies," or multiple conspiracies, to distribute drugs. Specifically, they argued that Gibson, the alleged ringleader, dealt with the other defendants on a one-to-one basis and that the others did not have "any knowledge of or relationship to" each other. As a result, the defendants asked for an instruction that they could not be convicted of the single conspiracy alleged in the indictment if the government's proof consisted only of distinct and unrelated conspiracies. As indicated, the district court refused the instruction.

We have held that "a multiple conspiracy instruction is not required unless the proof at trial demonstrates that appellants were involved only in separate conspiracies unrelated to the overall conspiracy charged in the indictment." United States v. Kennedy, 32 F.3d 876, 884 (4th Cir. 1994). The evidence here does not suggest separate conspiracies unrelated to the overall conspiracy charged in the indictment. In various of the taped conversations that were admitted, the defendants acknowledged, at least implicitly, their role in a larger organization. On one tape Gibson refers Cook to a supplier (or other intermediary) named "Fab." "Fab" is Blue's alias. Another tape has Blue and Cook on the telephone together talking with Gibson. In yet another tape, Johnson and Gibson ask each other for names of others from whom they might buy drugs. Cashwell makes a similar inquiry of Gibson in a later conversation. This evidence suggests that there was "one overall agreement" or "general business venture," United States v. Leavis, 853 F.2d 215, 218 (4th Cir. 1988), or that the defendants were "aware of [their] part in a larger organization," United States v. Vanwort, 887 F.2d 375, 383 (2d Cir. 1989) (citation omitted). In either case, the government established a single, integrated

7

conspiracy. As a result, a multiple conspiracy instruction was not required.

IV.

The defendants next argue that the district court erred in denying them access to certain FBI 302 reports, which were agents' notes of their interviews with confidential informants. The defendants argue that this denial was error on two grounds. First, they claim that Brady v. Maryland, 373 U.S. 83 (1963), required the government to turn over the 302s during discovery. Second, in the alternative, they argue that the reports were discoverable under the Jencks Act, 18 U.S.C. § 3500 (1994).

Under Brady a prosecutor's failure to disclose "evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady , 373 U.S. at 67. The defendants' only possible example of material discoverable under Brady concerns William Dupont, who pled guilty and testified at trial. The 302 report of Dupont's interview, which the government did provide during sentencing, revealed that Dupont was a heroin user. The defendants argue that the government should have handed over the 302 containing this impeaching material during discovery and that the district court committed reversible error in failing to compel its disclosure.

We disagree. To start with, defense counsel actually did learn during discovery that Dupont was a heroin user, and counsel admitted as much during sentencing. The defendants therefore cannot complain that they did not know Dupont used heroin. They do complain, however, that "[prosecutors] did not tell [them] he was a daily user in prodigious amounts." Brady is intended to provide counsel a fair opportunity to prepare a defense, including preparation for cross-examination of government witnesses. Here, the information the government provided to defense counsel, that William Dupont was a heroin user for a lengthy period, was sufficient to put counsel on notice for purposes of cross-examining Dupont about drug use. The government's disclosure satisfied Brady.

8

Even if the government withholds evidence favorable to the defense, reversal is appropriate "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). See also Kyles v. Whitley, 514 U.S. 419, 434 (1995). Though the government did not provide the Dupont 302 during discovery, defense counsel did learn about Dupont's heroin use during the discovery process. Moreover, the government raised the issue of Dupont's heroin use during his direct examination and made clear that he was a regular, long-time heroin user. As a result, by the end of Dupont's direct examination, defense counsel had all of the information to cross-examine Dupont about his drug use. A "reasonable probability of a different result is . . . shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." Kyles, 514 U.S. at 434 (citation omitted). Because all of the information was available by the time Dupont was cross-examined, there is not a reasonable probability that the outcome of the trial would have been different if the government had turned over the Dupont 302 report during discovery.

We also conclude that the Jencks Act did not require the government to turn over 302 reports written by FBI agents about witness interviews. Under the Jencks Act, after a witness called by the government has testified on direct examination, the government must produce "any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). A "statement," for our purposes, is "a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement." 18 U.S.C. § 3500(e)(2). The definition also includes a written statement "signed or otherwise adopted or approved by [the witness]." 18 U.S.C. § 3500(e)(1). Here, we have reports prepared by FBI agents consisting of witness interview notes that are not substantially verbatim accounts of the interviews. Moreover, there is no evidence that the witnesses signed, adopted, or approved the statements. The 302s therefore are not the witnesses' "statements" within the meaning of the Jencks Act. See, e.g., United States v. Roseboro, 87 F.3d 642, 646 (4th Cir. 1996); United States v. Foley, 871 F.2d 235, 239 (1st Cir. 1989); United States v. Blas, 947 F.2d 1320, 1326-27

9

(7th Cir. 1991). The district court did not err in refusing to require the government to produce the 302 reports.

V.

The defendants next claim that their Sixth Amendment rights were violated when the district court categorically denied all recross-examination. To expedite trial, the court established a ground rule that witness examination would consist of direct examination, cross-examination (limited to subjects raised on direct), and redirect examination (limited to subjects raised on cross). If a defendant wanted to explore topics not raised on direct examination or topics it believed were newly raised on redirect, the defendant was required to recall that witness. The defendants claim that this blanket denial of recross-examination was a violation of the Confrontation Clause of the Sixth Amendment.

The Confrontation Clause guarantees a criminal defendant an adequate opportunity for cross-examination. See Davis v. Alaska, 415 U.S. 308, 315-16 (1974). This right, however, does not extend as a matter of course to recross-examination. Instead, the Sixth Amendment requires recross-examination only when new material is discussed on redirect examination. See United States v. Ross, 33 F.3d 1507 (11th Cir. 1994) ("[a]s opposed to cross-examination, defendant has no constitutional right to recross-examination .. . [but] a defendant nonetheless does have a limited right to recross-examination where a new matter is brought out on redirect examination."); United States v. Baker, 10 F.3d 1374, 1404 (9th Cir. 1993) ("[a]llowing recross is within the sound discretion of the trial court except where new matter is elicited on redirect examination, in which case denial of recross as to that new matter violates the confrontation clause").

We do not find any instance when the defendants were denied recross-examination because of new material raised on redirect. As a result, there was no constitutional error. Moreover, violations of the Confrontation Clause are subject to harmless error analysis. See Coy v. Iowa, 487 U.S. 1012, 1021 (1988). Because the defense was permitted to recall witnesses if it wanted to explore new points brought out on redirect, any error in denying recross-examination was harmless.

10

VI.

Cook and Cashwell challenge the sufficiency of the evidence against them on the § 846 conspiracy charge. The following standard governs our sufficiency analysis: "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942).

The evidence is sufficient to sustain Cook's guilty verdict on the conspiracy charge. The government introduced telephone conversations between Cook and Gibson that permitted the jury to conclude that they were discussing the quality, testing, and arrival time of a shipment of heroin. Although neither man made a direct reference to preparing or selling heroin, the conversations, coupled with testimony explaining them, are sufficient to establish that Cook and Gibson were participating in a conspiracy to possess or distribute heroin. While speaking with Gibson, Cook describes a shipment as "real dark brown" -- heroin is a brown powder substance-- and noted that he "ke[pt] getting different readings" on a sample. In another conversation, Cook characterized some "shit" that he returned to Gibson as "pitiful" and "[not] worth keepin' for nobody." Finally, one conversation concludes with Gibson referring Cook to Blue, another member of the alleged conspiracy, to discuss the quality of a drug shipment. Other evidence also supported a finding that Cook knowingly participated in the conspiracy. A search of Cook's apartment produced $9,000 in cash and five bags of heroin. It also turned up a driver's license in defendant Blue's name but with Cook's picture and money orders in Blue's name. Finally, in a post-arrest conversation with an agent, Cook gave a broad but revealing account of the vagaries of the criminal lifestyle. All of this evidence taken together is sufficient to convict Cook of conspiracy to possess and distribute heroin.

The analysis is similar for Cashwell. The government introduced at least ten recorded telephone conversations between Cashwell and Gibson that, when explained and considered in context, showed that they were involved together in the drug trade. In one conversation, Cashwell relays reaction to a drug sample to Gibson:"that shit ain't nothin on sixth street. They gave it fives and sixes." In another conversation Cashwell asks Gibson when a shipment will come in and

11

whether Gibson is "on a good phone." Finally, in still another conversation, Cashwell appears to ask Gibson if he can recommend an alternate source for drugs. These taped conversations were sufficient to implicate Cashwell in the charged drug conspiracy.

VII.

Cook raises two other issues regarding the conduct of the trial. He says first that the district court erred in denying his motion for substitution of counsel after eleven weeks of trial. The denial of this motion is reviewed for abuse of discretion. See United States v. Mullen, 32 F.3d 891, 895 (4th Cir. 1994).

We consider three factors in evaluating a district court's denial of a motion to substitute: (1) whether the motion was timely, (2) whether the court made adequate inquiry into the defendant's complaint, and (3) whether attorney-client conflict was so great that it resulted in a total lack of communication, thereby preventing an adequate defense. Id. at 895. First, Cook's motion for substitution came eleven weeks into trial. It would have been disruptive to allow new counsel to take over Cook's defense at that late stage. Second, the court questioned Cook specifically about why he wanted to substitute counsel. After Cook mentioned some dissatisfaction with the way counsel had conducted the examination of witnesses, the district court asked if Cook had "anything more . . . to say about your dissatisfaction" with counsel, to which Cook replied that he did not. We believe this inquiry was adequate. Third, Cook gave no indication that his dissatisfaction with counsel had led to a breakdown in communication that was impeding the presentation of an adequate defense. Indeed, the district court found that counsel was providing Cook an adequate defense. The district court did not abuse its discretion in denying Cook's motion to substitute counsel.

Cook also claims that the prosecutor engaged in misconduct in closing argument. At trial Agent Lisi testified about a 15- to 20-minute conversation he had with Cook after his arrest. During the exchange Cook discussed how crime had gotten worse in the District of Columbia, how the criminal life was "not like it used to be in the old days," and how "whenever I wake up . . . there's a chance [I] might not return home that day . . . and that's pretty much the way

12

it is with me and my lifestyle." In closing the prosecutor characterized Cook's discussion with Agent Lisi as a "confession." This character-ization, Cook contends, was improper and requires that his conviction be vacated.

For us to set aside a conviction for prosecutorial misconduct in closing argument, a defendant must show (1) that the prosecutor's remarks were improper and (2) that they prejudicially affected the defendant's substantial rights so as to deprive him of a fair trial. United States v. Wilson, 135 F.3d 291, 297 (4th Cir. 1998). We have found it improper for a prosecutor to characterize as a confession statements similar to those made by Cook. See United States v. Morsley, 64 F.3d 907, 912-13 (4th Cir. 1995) (finding it improper for prosecutor to say the defendant had confessed when he "had merely related aspects of his conduct to government agents."). Because Cook talked about the pressures of the drug dealing lifestyle in general terms without directly implicating himself in the conspiracy charged, we think it was improper for the prosecution to characterize his state-ments as a confession.

To set Cook's conviction aside, however, we also must find preju-dice. We have said that:

> Several factors are relevant to the determination of preju-dice, including:
>
> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to preju-dice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the com-ments were deliberately placed before the jury to divert attention to extraneous matters.
>
> We also consider (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel and (6) whether curative instructions were given to the jury. These factors are examined in the context of the entire trial, and no one factor is dispositive.

13

Of the factors that apply readily to this case, all weigh against Cook. Specifically, we do not believe that the "confession" remark misled the jury or diverted its attention from the evidence in the case. When Agent Lisi testified, he gave a full account of his conversation with Cook. And, although the prosecutor labeled what Cook said as a confession, the prosecutor went on to detail the statements that Cook made to the agent. The jury was therefore able on its own to decide whether Cook's statements to Agent Lisi actually implicated Cook in the conspiracy charged in the indictment. Finally, as we have already indicated, see part VI, supra , the competent evidence against Cook was strong. He was not prejudiced by the "confession" remark, and we decline to vacate his conviction because of it.

VIII.

Johnson contends that the district court erroneously determined the weight of the cocaine base attributable to him for sentencing purposes. The authorities seized two blocks of a substance believed to be cocaine base from Johnson's house. A forensic chemist conducted a presumptive test on each block that identified each as containing cocaine base. The chemist mixed the blocks together before conducting the final test which confirmed that the substance was cocaine base with a total weight of 184.7 grams. Based on the chemist's testimony, the court assessed the total weight at 184.7 grams for sentencing purposes. Johnson contests the court's weight finding because he believes that it included weight attributable to an excessive amount of water.

The Sentencing Guidelines provide that "the weight of a controlled substance . . . refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." United States Sentencing Commission, Guidelines Manual , § 2D1.1(c), Drug Quantity Table n.(A) (Nov. 1998). The Supreme Court has given a broad interpretation of what may be included in a "mixture" for Guidelines purposes. See Chapman v. United States, 500 U.S. 453 (1991) (holding that the weight of the blotter paper on which LSD is imbedded is to be included in calculating weight for sentencing purposes). Here, the chemist testified that 51 percent of the weight of the

14

sample he tested (from the combined lot) was attributable to cocaine base. He testified that the remaining 49 percent contained water and traces of sodium bicarbonate and acetaminophen. The district court found that the water in the cocaine base was usable, based on the chemist's testimony that the water in the mixture could be inhaled by vaporizing it. The district court did not err in using the entire weight of the mixture in calculating Johnson's sentence.

IX.

We have considered the other issues raised by the defendants, see supra, part I, and we find them to be without merit.

The convictions and sentences are affirmed.

AFFIRMED

15