**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-6814

THOMAS T. PROUSALIS, JR.,

Petitioner - Appellant,

v.

CHARLES E. MOORE, Senior U.S. Probation Officer,

Respondent – Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. John A. Gibney, Jr., District Judge. (3:12-cv-00134-JAG)

Argued: March 19, 2014                Decided: May 7, 2014

Before TRAXLER, Chief Judge, and WILKINSON and KEENAN, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Keenan joined. Chief Judge Traxler wrote an opinion concurring in the result.

**ARGUED**: Scott Martin, GIBSON, DUNN & CRUTCHER, LLP, Washington, D.C., for Appellant. Jonathan Holland Hambrick, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF**: Dana J. Boente, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

WILKINSON, Circuit Judge:

Appellant Thomas Prousalis Jr. pled guilty to three counts arising from his fraudulent activity in connection with a client's initial public offering. He now seeks habeas relief, contending that, in light of the Supreme Court's intervening decision in Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296 (2011), the conduct for which he was convicted is no longer criminal. For the following reasons, we reject Prousalis's claims and affirm the dismissal of his petition.

I.

Thomas Prousalis was a securities lawyer who marketed his services to small firms seeking to raise capital. At issue here is his representation of Busybox.com, Inc. (Busybox), an internet company that he guided through the process of conducting an initial public offering (IPO). Despite Busybox's modest size and limited cash flow, Prousalis persuaded company management to agree to an initial offering of over $10 million. Prousalis's retainer agreement provided that he would be compensated the greater of $375,000 or 7.5 percent of the gross proceeds; notably, his fee was contingent upon the successful closing of the IPO. To effectuate the transaction, Busybox also hired Barron Chase Securities, Inc., an investment banking firm, which agreed to provide a firm commitment underwriting. This

2

agreement obligated Barron Chase to purchase all of the available Busybox shares and then resell them to the public.

Prousalis prepared the IPO registration materials, which were subsequently signed by Busybox officers and filed with the Securities and Exchange Commission (SEC). The materials stated that Busybox intended to raise $12.8 million in gross proceeds through the offering, with net receipts of $10.6 million. The forms also reported Prousalis's legal fee, but failed to acknowledge the contingent nature of his compensation. When Busybox's CEO attempted to correct the registration statement to accurately reflect Prousalis's retainer agreement, Prousalis insisted that the existing description was compliant and that the SEC had confirmed its sufficiency. Prousalis later admitted in his plea allocution that he knew at the time that Busybox would not be listed on the NASDAQ exchange if his compensation arrangement were accurately disclosed.

Prousalis soon became aware that Barron Chase was unwilling to complete a firm commitment underwriting of the IPO. Barron Chase's failure to uphold its end of the bargain generated a shortfall of $2.5 million in the IPO as originally conceived. To solve this problem, Prousalis orchestrated a scheme in which IPO proceeds were recycled in order to purchase shares that were then used both to compensate him (in a sum unrelated to his retainer agreement) and to pay salaries and bonuses to Busybox

3

officers. Prousalis failed to disclose these maneuvers to the SEC. Only after the initial offering was made did he reveal to Busybox officers the existence of the shortfall and his proposed remedy. The judge presiding over Prousalis's earlier collateral proceeding noted that "Prousalis specifically admitted that at the time he did each of these acts he knew he was doing something wrong, knew he was acting in violation of the law, and was acting with the intent to deceive and defraud investors in Busybox securities." Prousalis v. United States, Nos. 06 Civ. 12946(DLC), 03 CR. 1509, slip op. at 5 (S.D.N.Y. Aug. 24, 2007).

As a result of these activities, Prousalis was indicted in the Southern District of New York on three counts. Count One charged conspiracy to commit securities fraud, wire fraud, and mail fraud (in violation of 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5; 18 U.S.C. §§ 371, 1343, 1346, 1341). Count Two charged securities fraud (in violation of 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2). Finally, Count Three charged "failure to disclose interest of counsel" in the registration materials Prousalis prepared in connection with the IPO (in violation of 15 U.S.C. § 77x; 17 C.F.R. § 228.509; 18 U.S.C. § 2). J.A. 225-49. As relevant for purposes of this appeal, Prousalis's convictions hinged in large part on his violation of SEC Rule 10b-5, which implements Section 10(b) of the Securities Exchange Act of 1934. The Rule provides:

4

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. 15 U.S.C. § 78ff subjects certain violators of Rule 10b-5 to criminal penalties. 15 U.S.C. § 78ff(a) ("Any person who willfully violates any provision of this chapter . . . or any rule or regulation thereunder the violation of which is made unlawful . . . shall upon conviction be fined not more than $5,000,000, or imprisoned not more than 20 years, or both . . . .").

Trial commenced but was aborted when Prousalis agreed to plead guilty to each count pursuant to a plea agreement. The district court subsequently sentenced Prousalis to 57 months of imprisonment, followed by three years of supervised release. He was also ordered to pay $12.8 million in restitution. Prousalis appealed to the Second Circuit but lost on the basis of the appeal waiver contained in his plea agreement. J.A. 460. In 2006, he filed a petition for collateral review under 28 U.S.C. § 2255, alleging ineffective assistance of counsel and Fifth and Sixth Amendment violations. The district court denied his petition and the Second Circuit affirmed the dismissal.

5

Pursuant to the savings clause of 28 U.S.C. § 2255, Prousalis later filed a habeas petition in the Eastern District of Virginia -- the site of his supervised release -- under 28 U.S.C. § 2241, naming his probation officer as respondent. As explained below, Prousalis is only eligible for relief under § 2241 if the conduct for which he was originally convicted is no longer deemed criminal. The district court denied his motion, citing two alternative rationales. First, it concluded that the decision upon which Prousalis relies, Janus, has no application in the criminal context. Second, it determined that Prousalis pled guilty to charges -- such as aiding and abetting -- that fall outside the substantive scope of the Janus decision, which only addresses primary liability under the securities laws. The court thus concluded that Prousalis's petition constituted an "unauthorized, successive § 2255" motion and dismissed for lack of jurisdiction. J.A. 557. This appeal followed.

II.

Prousalis may file a habeas petition under § 2241 only if the collateral relief typically available under § 2255 "is inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e). This standard is satisfied when:

> (1) [A]t the time of conviction, settled law of this circuit or the Supreme Court established the legality of the conviction; (2) subsequent to the prisoner's

6

direct appeal and first § 2255 motion, the substantive law changed such that the conduct of which the prisoner was convicted is deemed not to be criminal; and (3) the prisoner cannot satisfy the gatekeeping provisions of § 2255 because the new rule is not one of constitutional law.

In re Jones, 226 F.3d 328, 333-34 (4th Cir. 2000). The parties here agree that conditions (1) and (3) are satisfied.

Prousalis bases his argument under prong (2) on the Supreme Court's decision in Janus, which was handed down subsequent to his direct appeal and § 2255 motion. In that case, the Court defined what it means to "make" an untrue statement in the context of a private action alleging a Rule 10b-5 violation. According to the Court, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." Janus, 131 S. Ct. at 2302. It added that "[w]ithout control, a person or entity can merely suggest what to say, not 'make' a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker." Id. The Court analogized its rule to the relationship between a speaker and speechwriter: "Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit -- or blame -- for what is ultimately said." Id.

7

Prousalis contends that, under Janus, he does not qualify as the "maker" of any false statements contained in Busybox's registration materials. Instead, Busybox itself -- the entity with the ultimate legal authority over the SEC filings -- is the maker for purposes of 10b-5. If this interpretation of Janus is correct, then Prousalis arguably stands condemned (at least in part) of conduct which is no longer deemed criminal. On the other hand, Prousalis's convictions unquestionably remain valid if his reading of Janus is mistaken. He does not contest that his guilty pleas were legitimate at the time they were entered and remain so in the absence of Janus. For the reasons that follow, we find Janus inapplicable outside the context of the 10b-5 implied private right of action. That case thus does not affect Prousalis's criminal convictions. Because his convictions are proper under current law, his § 2241 petition necessarily fails.[*]

A.

Neither Section 10(b) of the Securities Exchange Act nor SEC Rule 10b-5 explicitly provides for a private right of action to enforce the prohibitions established therein. Nevertheless,

---

[*] Because we find that Janus does not apply to Prousalis's criminal convictions, we need not reach the government's alternative argument that his convictions are sustainable on a theory of secondary liability, the requirements for which were not affected by Janus.

8

in Superintendent of Insurance v. Bankers Life & Casualty Co., the Supreme Court stated that the existence of such a right was "established." 404 U.S. 6, 13 n.9 (1971). The precise scope of this judicially created cause of action has been the source of continuing disagreement. See, e.g., Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148 (2008); Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994). The Supreme Court's general inclination over the past several decades has been to restrict the right; Congress, similarly, has declined to expand it. See, e.g., Janus, 131 S. Ct. at 2302; Alexander C. Krueger-Wyman, Note, Making a Statement About Private Securities Litigation: The Merits and Implications of the Supreme Court's Janus Capital Case, 98 Va. L. Rev. 1621, 1621 (2012).

The Janus opinion itself makes clear the limits of its reach. Janus concerned the ability of a private plaintiff invoking the 10b-5 implied right to sue a mutual fund investment adviser. Janus, 131 S. Ct. at 2299. The scope of the Court's opinion was established at the outset: "We granted certiorari to address whether [the adviser] can be held liable in a private action under Rule 10b–5 for false statements included in [its client's] prospectuses." Id. at 2301 (emphasis added). Moreover, the Court's reasoning -- like its framing of the issue -- indicates that its holding was confined to cases invoking the

9

implied private right of action and does not extend to the criminal convictions at issue here. Several points merit particular attention.

First, the Court stated that its rule "follows from Central Bank of Denver, . . . in which we held that Rule 10b–5's private right of action does not include suits against aiders and abettors." Id. at 2302. The Janus Court reasoned that a more expansive interpretation of primary liability under the implied right would functionally render aiders and abettors a null set, thus draining the Central Bank decision of any concrete impact. Id. In this respect, Janus works in tandem with Central Bank to impart a coherent structure to the 10b-5 implied cause of action. The reasoning in both decisions is born out of concerns specific to the implied civil right since, as the parties agree, aiding and abetting is plainly available under the criminal law. Central Bank in fact makes the distinction explicit: "while it is true that an aider and abettor of a criminal violation of any provision of the 1934 Act, including § 10(b), violates 18 U.S.C. § 2, it does not follow that a private civil aiding and abetting cause of action must also exist." Central Bank, 511 U.S. at 190.

Second, the Janus Court also relied heavily on Stoneridge, another decision involving the scope of the 10b-5 private action. In that case, plaintiffs sued "entities who, acting both as customers and suppliers, agreed to arrangements that allowed

10

the investors' company to mislead its auditor and issue a misleading financial statement affecting the stock price." Stoneridge, 552 U.S. at 152-53. Relevantly, the Stoneridge Court observed that "nothing [defendants] did made it necessary or inevitable for [the company] to record the transactions as it did." Id. at 161. The Janus Court found this logic compelling, noting that, unless a bad actor possesses ultimate authority, it is not "necessary or inevitable" that the falsehoods he propagates will appear in any final statement filed with the SEC. Janus, 131 S. Ct. at 2303 (internal quotation marks omitted).

Janus thus meshes seamlessly with the reasoning of the Supreme Court's recent 10b-5 private right of action cases. In all three decisions (Central Bank, Stoneridge, and Janus), the context is everything. Apart from its specific dependence on Central Bank and Stoneridge, however, the Janus opinion evinces a general desire to circumscribe implied causes of action. At the outset, the Court observes that:

> "Concerns with the judicial creation of a private cause of action caution against its expansion." Thus, in analyzing whether [defendant] "made" the statements for purposes of Rule 10b–5, we are mindful that we must give "narrow dimensions . . . to a right of action Congress did not authorize when it first enacted the statute and did not expand when it revisited the law."

_Id._ at 2302 (quoting _Stoneridge_, 552 U.S. at 165, 167) (internal alteration and citations omitted). The Court summarizes its analysis by noting, "Our holding also accords with the narrow scope that we must give the implied private right of action." _Id._ at 2303. These concerns are specific to the dangers of judicially implied causes of action. Nowhere is there the suggestion that criminal sanctions for security fraud violations would be similarly imperiled.

Prousalis argues in rebuttal that _Janus_ rested primarily on a straightforward reading of Rule 10b-5's text, and that the Court's desire to limit the implied right merely confirmed its textual conclusion. In support of this argument he highlights _Janus_'s statement that the word "make" in Rule 10b-5 is "not . . . ambiguous." _Id._ at 2304 n.8.

But this and similar language only reinforce our analysis. Any textual conclusion announced in this particular area of law would not be casually generalizable to the criminal context which, as discussed below, presents a wholly different set of issues. "[T]he meaning of statutory language, plain or not, depends on context." _King v. St. Vincent's Hosp._, 502 U.S. 215, 221 (1991). A facially ambiguous or vague word can be rendered determinate by the setting in which it appears. _See FDA v. Brown & Williamson Tobacco Corp._, 529 U.S. 120, 132 (2000) ("The meaning -- or ambiguity -- of certain words or phrases may only

12

become evident when placed in context."). Petitioner's position would render the Supreme Court's discussion of private rights of action largely superfluous. We decline to disfigure the Court's analysis of civil actions by wrenching its conclusion from the distinctive contextual considerations that gave it birth.

B.

Our interpretation of Janus is further supported by considerations of judicial restraint and legislative primacy. The Janus Court's discomfort with implied rights of action reflected the fact that "[t]he regulation of access to the courts is largely a legislative task, and one that courts should hesitate to undertake." Smith v. Reagan, 844 F.2d 195, 201 (4th Cir. 1988). As Stoneridge emphasized, "In the absence of congressional intent the Judiciary's recognition of an implied private right of action . . . . runs contrary to the established principle that the jurisdiction of the federal courts is carefully guarded against expansion by judicial interpretation." 552 U.S. at 164 (internal quotation marks and alteration omitted). "For this reason, implied rights of action are disfavored, and will not be found in the absence of clear evidence of legislative intent." Smith, 844 F.2d at 201.

It is not just that judicially created causes of action are disfavored. It is that congressional control of federal court jurisdiction and, more specifically, of the elements of federal

13

criminal offenses have long been respected. As a result, the Court's willingness to constrict an implied civil right tells us very little about its views regarding the scope of a congressionally authorized action lying squarely within the legislature's traditional prerogative to prescribe crimes and ranges of punishment. See United States v. Lanier, 520 U.S. 259, 265 n.5 (1997) (noting "the deference due to the legislature, which possesses the power to define crimes and their punishment"). A part of the Janus Court's unease stemmed, as noted earlier, from the fact that the case involved "a right of action Congress did not authorize when it first enacted the statute and did not expand when it revisited the law." Janus, 131 S. Ct. at 2302 (quoting Stoneridge, 552 U.S. at 167) (internal quotation marks omitted). This concern is absent when Congress has in fact acted. The gulf between these two domains of law makes it difficult to extrapolate from one to the other. The Janus Court gave no indication that it intended to curtail the government's criminal enforcement, nor did the opinion suggest that it even contemplated the issue. Explicit congressional prohibitions simply operate in a different universe than the one inhabited by Janus.

Indeed, the Court has noted on many occasions that "Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed 'not technically and

14

restrictively, but flexibly to effectuate its remedial purposes.'" Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 151 (1972) (quoting SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195 (1963)). Prousalis himself has offered no reason to believe that the concerns attendant upon implied rights of action -- concerns of legitimacy, institutional competence, and judicial policymaking -- are implicated by prosecutions such as the one at issue here. All of the statutes to which Prousalis pled guilty fall within the acknowledged powers of Congress. Petitioner has made no contention that the prohibitions to which he pled guilty are in any way unconstitutional or otherwise illegitimate. Furthermore, Prousalis's conduct falls within the heartland of congressional concern: he orchestrated a sophisticated scheme to defraud both his own client and Busybox investors in the securities markets out of hundreds of thousands (if not millions) of dollars for his personal gain. It is hard to imagine a scenario more germane to Congress's intentions in enacting the securities laws. Prousalis has simply failed to proffer any compelling reason for placing his conduct outside the reach of the criminal law.

In sum, to broaden Janus's holding beyond the domain of implied rights would represent a stark assertion of judicial will, the very thing against which Janus itself inveighed. The majority in Janus gave not the slightest indication that its

15

holding applied beyond the implied civil context: the four dissenters resisted taking the law even that far. As counsel for petitioner candidly noted at oral argument, no other appellate court has adopted Prousalis's argument; indeed, counsel was unable to identify a single district court that had applied Janus in the criminal context. There is a good reason for this dearth of cases. It is not the role of courts to blaze new trails into uncharted territory in the absence of any clear textual or precedential mandate for doing so. Considerations of judicial restraint and modesty militate against such an untethered venture. In the absence of more affirmative indications from either Congress or the Supreme Court, we decline to work such an avulsive change in law on our own.

## III.

For the foregoing reasons, we reject Prousalis's arguments and affirm the dismissal of his petition.

<u>AFFIRMED</u>

16

TRAXLER, Chief Judge, concurring in the result:

"Under Rule 10b-5, it is unlawful for 'any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact' in connection with the purchase or sale of securities." Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2301 (2011) (quoting 17 C.F.R. § 240.10b-5(b)) (alterations in original). The Supreme Court in Janus held that "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." Id. at 2302. Although I believe "make" has the same meaning in the criminal context as it does in the context of a private right of action, I nevertheless would affirm.

Prousalis argues that the conduct underlying his convictions is no longer illegal because Janus demonstrates that it was Busybox, and not he, who made the statements that were the basis for his convictions. However, that it was Busybox that made the statements does not negate the illegality of Prousalis's causing Busybox to make them. Subsection 2(b) of Title 18 states that "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." That provision "is intended to impose criminal

17

liability on one who causes an intermediary to commit a criminal act, even though the intermediary who performed the act has no criminal intent and hence is innocent of the substantive crime charged." United States v. Richeson, 825 F.2d 17, 20 (4th Cir. 1987) (internal quotation marks omitted). Subsection 2(b) "does not set forth an essential element of the offense with which the defendant is charged or itself create a separate offense." United States v. Ashley, 606 F.3d 135, 143 (4th Cir. 2010). Thus, a defendant can be liable under § 2(b) regardless of whether the indictment even charges that provision.[1] See id.

Prousalis's willful intent to defraud, combined with Busybox's duty not to make the charged material misrepresentations and omissions, made it a crime for Prousalis to cause Busybox to make the statements at issue. Thus, his contention that the conduct underlying his convictions is no longer illegal after Janus is simply incorrect, and the district court properly dismissed his petition.[2]

---

[1] The indictment did expressly charge 18 U.S.C. § 2 with regard to Counts Two and Three.

[2] Count One alleged a conspiracy, the objective of which was to commit securities fraud, wire fraud, and mail fraud. Even if under Janus the alleged conduct did not amount to conspiracy to commit securities fraud, it still amounted to conspiracy to commit wire fraud and mail fraud, and this provides an additional basis for affirmance concerning Count One.

18