22-3125 (L)
*United States v. Chartier*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

*Rulings by summary order do not have precedential effect. Citation to a summary order filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this court's Local Rule 32.1.1. When citing a summary order in a document filed with this court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.*

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 1st day of August, two thousand twenty-four.

PRESENT:    Steven J. Menashi,
            Beth Robinson,
            Maria Araújo Kahn,
                    *Circuit Judges.*

_____

UNITED STATES OF AMERICA,

      *Appellee,*

    v.                                                        No. 22-3125 (L), 23-6080 (CON)

JEFFREY CHARTIER, LAWRENCE ISEN,

      *Defendants-Appellants,*

STEPHANIE LEE, MICHAEL WATTS, ROBERT GLECKMAN, ERIK MATZ, RONALD HARDY, BRIAN HEEPKE, AKA Brian Targis, DENNIS VERDEROSA, EMIN L. COHEN, ANTHONY VASSALLO, PAUL EWER, McARTHUR JEAN, AKA John McArthur, ASHLEY ANTOS, ROBERT GILBERT, SERGIO RAMIREZ,

*Defendants.*[*]

_____

| | |
|---|---|
| *For Appellee*: | KAITLIN T. FARRELL (Amy Busa, Whitman G.S. Knapp, *on the brief*), Assistant United States Attorneys, *for* Breon Peace, United States Attorney for the Eastern District of New York, Brooklyn, New York. |
| *For Chartier*: | MATTHEW W. BRISSENDEN, Matthew W. Brissenden, P.C., Garden City, New York. |
| *For Isen:* | GWEN M. SCHOENFELD, Law Office of Gwen M. Schoenfeld, LLC, New York, New York. |

Appeal from a judgment of the United States District Court for the Eastern District of New York (Seybert, J.).

Upon due consideration, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the judgment of the district court is **AFFIRMED**.

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

Defendants-Appellants Jeffrey Chartier and Lawrence Isen were convicted of, *inter alia*, securities fraud and conspiracy to commit securities fraud for their involvement with PowerTraders Press ("PowerTraders" or the "Boiler Room"), a pump-and-dump boiler room that pushed penny stocks on mostly elderly investors. Chartier and Isen each separately hired the Boiler Room to promote two microcap companies in which they or their affiliates owned stock. The Boiler Room cold-called potential victims and used high-pressure sales tactics and fraudulent misrepresentations and omissions to induce them to purchase stock in the companies the Boiler Room was promoting. Once the Boiler Room's employees had convinced an investor to place an order for a certain number of shares at a certain price, the Boiler Room would contact Chartier, Isen, or one of their co-conspirators so that they could sell their shares to fill the incoming buy order. The purposes of the scheme included artificially inflating the companies' stock prices and allowing Chartier, Isen, and their co-conspirators to sell their shares at a profit.

Chartier and Isen appealed their convictions and sentences, and their appeals were consolidated before this court. Chartier and Isen challenge the sufficiency of the government's evidence of a single, overarching conspiracy; the district court's instructions to the jury regarding "matched trades" and material misrepresentations or omissions under Rule 10b-5; and certain aspects of their sentences. We assume the parties' familiarity with the facts, procedural history, and issues on appeal.

**I**

The fraudulent scheme in this case centered on the Boiler Room, an entity that "promoted the stocks of publicly traded companies to individual investors, primarily through cold-call campaigns and the circulation of a newsletter." Chartier App'x 146.[1]  The Boiler Room maintained websites on which it described

---

[1] The Boiler Room did business at various times under the names Dacona Financial, PowerTraders Press, Trade Masters Pro, and My Street Research.

3

itself as "an 'unbiased stock research firm' that provided 'top notch, detailed, unbiased research.'" Chartier App'x 147. In fact, as Erik Matz, who ran the Boiler Room, testified, "[w]e were a pump and dump boiler room. We pushed penny stocks. That was the business." Isen App'x 263.[2] The government asserts that the defendants used the Boiler Room to "illegally sell, or 'push,' unsuspecting victims the penny stocks of microcap companies they controlled, while selling shares of those penny stocks that they or their co-conspirators controlled at a profit." Appellee's Br. 8.[3]

## A

At the time of the events leading to these charges, Defendant Jeffrey Chartier was a former registered broker-dealer who served as president and member of the board of National Waste Management Holdings, Inc. ("NWMH"), and member of the board of CES Synergies, Inc. ("CESX"). Chartier was appointed to these positions after he assisted in taking NWMH and CESX public. In exchange for this assistance, Chartier requested to be paid in stock through an entity called Strategic Capital Markets ("SCM"), which he controlled with his friend and business partner Stephanie Lee. As an insider, however, Chartier was permitted to own only restricted shares—that is, shares that cannot be freely traded in the market. Chartier nonetheless acquired free-trading shares by executing fraudulent consulting agreements on behalf of SCM.

---

[2] According to the initial indictment, a "pump-and-dump" scheme is "a scheme in which a group of individuals who control[] the free trading of allegedly unrestricted shares, also referred to as the 'float,' of a microcap company fraudulently inflate[] the share price and trading volume of the targeted public company through, *inter alia*, wash and matched trades, press releases and paid stock promotions. When the target company's share price reache[s] desirable levels, the individuals s[ell] their free trading shares for substantial financial gain." Chartier App'x 100-01.

[3] "Microcap" or "penny" stocks are "stocks of publicly traded U.S. companies that have a low market capitalization." Chartier App'x 149.

After CESX went public, Chartier and Lee were introduced to Anthony Vassallo, who managed Elite Stock Research ("Elite"), another boiler room that preceded the one operated by Matz. Chartier and Vassallo executed a fraudulent consulting agreement between Type A Partners, a company that Lee controlled, and Elite. Pursuant to the agreement, Elite would help Chartier and Lee sell 250,000 of their CESX shares and would receive 250,000 free-trading shares as compensation. This was the first in a series of fraudulent consulting agreements—first with Elite, later with Matz's operation—to conceal payments to the boiler rooms in connection with illegal pump-and-dump schemes.

As part of these schemes, once the boiler room had lined up a buyer at a certain price and volume, the boiler room arranged for Lee or Chartier to sell their shares at the same time and at the same price and volume. Each of the five testifying victims said that they were never told that the Boiler Room was paid to promote the stock or that the Boiler Room coordinated with sellers of the stock.[4]

Chartier eventually took his business to PowerTraders after Matz, who had previously worked at Elite, launched it as his own boiler room. Chartier hired PowerTraders to promote CESX and eventually NWMH as well. As part of that business relationship, Chartier and Lee visited and received a "tour" of the Boiler Room. Isen App'x 379-80. Chartier and Matz negotiated agreements that specified the number of shares Matz would receive and could sell on his own behalf in exchange for selling shares for Chartier and Lee. The Boiler Room's proceeds also paid for the corporate expenses of CESX and the personal expenses of Lee and Chartier. According to the Presentence Report, Chartier and Lee used the Boiler Room to promote CESX from approximately March 2014 to August 2015 and

---

[4] Although Elite and PowerTraders maintained websites which disclosed that they had been paid to promote stock and actually held positions in such stock, this was not disclosed to potential buyers during cold-calls. The initial consulting agreement between Type A Partners and Elite stated that the latter would disclose its position in CESX to potential investors. Subsequent consulting agreements also contained such language.

NWMH from approximately January 2015 to April 2016.[5] The district court accepted the findings in the Presentence Report.

**B**

Defendant Lawrence Isen was a former registered broker-dealer who was barred from the industry in the mid-1990s and worked as a professional marketer during the relevant time period for this case. Isen and his associate Michael Watts hired the Boiler Room to promote a company called Hydrocarb Energy Corporation ("Hydrocarb"), in which Isen owned stock. Matz testified that his pitch to Isen and Watts on PowerTraders's services was as follows:

> I had said that we had no problems supporting the stock. We have that availability. I made it known that I had accounts, that if need be, if the stock had a bad day, if it gets hit, we have the ability to go in buy the stock later and dump it out on a shareholder down the line.

Isen App'x 489-90. Isen also visited the Boiler Room several times.

At first, Isen simply sold his personal shares of Hydrocarb on the open market, albeit with the knowledge that the demand for Hydrocarb shares was being created by the Boiler Room. However, Isen later began engaging in matched trades—paying Matz in exchange for arranging sales of Isen's stock to specific Boiler Room victims—after Watts began having difficulty paying Matz.

When Isen and Watts continued to have difficulty paying Matz in early 2015, they turned to Robert Gleckman, a former registered broker-dealer and friend of Isen's, who owned shares in Hydrocarb. Isen had Gleckman execute a fraudulent consulting agreement so that his shares would become free-trading shares. Gleckman then sold his 262,000 shares on the open market and used the proceeds to pay Matz. Matz sent Gleckman and Isen a fake invoice for this payment.

---

[5] The government states that "PowerTraders pushed CESX stock from approximately August 2014 to January 2015, and NWMH stock from approximately January 2015 to March 2016." Appellee's Br. 21. Chartier does not specify a time period for each scheme.

Gleckman received 1,000,000 more shares of Hydrocarb pursuant to another fraudulent consulting agreement, and he then transferred 600,000 of those shares to Isen pursuant to yet another fraudulent consulting agreement.

Beginning in the fall of 2015, Isen and Watts conspired with Matz to execute numerous matched trades. Isen and Watts were paying Matz half of the profits, and Isen prepared and sent invoices to cover up the illegal payments. According to the Presentence Report, Isen, Watts, Matz, Gleckman, and others manipulated the price of Hydrocarb stock from approximately August 2014 to January 2016.[6]

Hydrocarb's stock crashed in the spring of 2016 after it failed to secure financing, and Isen hired Matz to promote another company called Intelligent Content Enterprises, Inc. ("ICEIF"). Isen's business contact, James Cassina, "had control over" a large block of ICEIF shares owned by investors in India. Isen App'x 569. Isen, Cassina, and Matz agreed to sell the Indian investors' shares to Boiler Room victims and split the profits. They also conspired to reverse-engineer the invoices to make it appear as though PowerTraders was being paid for hours worked rather than the volume of ICEIF shares sold to victims; the goal was "to really make it look like [PowerTraders was] doing consulting and PR services." *Id.* at 570. After the Indian investors' shares were sold out in April 2016, Isen apparently arranged for another overseas investor to fill ICEIF orders coming into the Boiler Room. According to the Presentence Report, Isen, Matz, and others manipulated the stock of ICEIF from approximately February 2016 to July 2016.[7]

---

[6] The government states that "Matz pushed [Hydrocarb] from mid-2014 through Spring 2016." Appellee's Br. 9. Isen states that the Boiler Room "stopped pushing Hydrocarb around March/April 2016." Isen Br. 30. The district court accepted the findings in the Presentence Report.

[7] The government states that "Matz pushed … ICEIF from March 2016 through December 2016." Appellee's Br. 9. Isen likewise states that "Matz promoted ICEIF stock from March through mid-December 2016." Isen Br. 30.

## C

On July 11, 2017, Chartier, Lee, Isen, Watts, Gleckman, Matz, and other co-conspirators were indicted in the Eastern District of New York. By August 2019, all of the defendants had pleaded guilty except for Chartier, Isen, Lee, and Watts. Accordingly, on August 5, 2019, the grand jury returned a superseding indictment as to Chartier, Lee, Isen, and Watts that focused on the manipulation of CESX, NWMH, Hydrocarb, and ICEIF. Chartier, Isen, Lee, and Watts were all charged in a single securities fraud conspiracy. Watts was tried separately and convicted on all counts on October 23, 2019. Lee pleaded guilty pursuant to a cooperation agreement on January 24, 2020.

Isen and Chartier proceeded to trial, which began on February 10, 2020, and lasted six weeks. During the trial, Matz testified that his account executives did not disclose to customers that the Boiler Room was being paid to promote the stocks they were pushing or that buy orders would be filled by co-conspirators. Matz also testified regarding the procedure for matching incoming buy orders from victims with Chartier, Isen, or other co-conspirators. Lee was called as a witness by both the government and Chartier. The government put on an expert witness to explain concepts such as pump and dumps, penny stocks, manipulative trading, wash trades, and matched trades. The government's expert also testified about phone calls between Matz and Chartier, Lee, Isen, and Watts that coincided with alleged matched trades. Isen also called an expert who testified that Isen did not engage in matched trades, that Hydrocarb and ICEIF were not thinly traded stocks, and that it would have been difficult or impossible for Isen to manipulate the price of these stocks because there were many other trades occurring on any given day.

On March 18, 2020, the jury found Chartier and Isen guilty on all counts with which they were charged. Chartier and Isen filed post-trial motions, including motions for a new trial. The district court denied these motions in a 156-

page opinion on August 26, 2021. *See United States v. Chartier*, No. 17-CR-0372, 2021 WL 3795352 (E.D.N.Y. Aug. 26, 2021).

The Probation Office assigned both Chartier and Isen an offense level of 43 for the purpose of sentencing. It assigned a criminal history category of II to Chartier and a criminal history category of I to Isen, and as a result it recommended a sentence of 180 months of incarceration for Chartier and a sentence of 84 months of incarceration for Isen. These recommendations included enhancements under U.S.S.G. § 2B1.1(b)(1) of 24 and 22 levels for Chartier and Isen, respectively. The Probation Office calculated the loss attributable to Chartier and Isen at $87,189,670 and $43,005,450, respectively, based on the amount by which the market capitalization of CESX, NWMH, Hydrocarb, and ICEIF were inflated. In its sentencing submission, the government calculated Chartier's and Isen's offense levels at 39 and 43, respectively, and recommended a sentence of 180 months of incarceration for Chartier and a sentence of 240 months of incarceration for Isen.

Chartier asked for a non-custodial sentence, citing his role as primary caregiver for his two children. Chartier also submitted an expert report arguing that the loss ascribed to him for purposes of U.S.S.G. § 2B1.1 should be based on losses to identified victims, which was calculated at $12,305,980, rather than the fraudulent inflation of the market capitalization of CESX and NWMH, which the Probation Office calculated at $87,189,670. The government responded that it would not oppose Chartier's loss calculation because it reduced his total offense level only to 38.

Isen requested "a non-Guidelines sentence of not more than the sentence of one year and one day imposed on [his] co-defendant, Michael Watts." Isen App'x

9

2109.[8] Isen and his expert also contested the government's loss calculations for purposes of U.S.S.G. § 2B1.1. The district court rejected one of the four-level enhancements that the Probation Office and the government had recommended with respect to both defendants—reducing Chartier's and Isen's offense levels to 34 and 39, respectively—but otherwise adopted the government's guidelines calculation. The district court imposed a sentence of 120 months of imprisonment, $6,083,603.45 in restitution, and $1,022,398.89 in forfeiture for Chartier and 60 months of imprisonment, $8,061,286.22 in restitution, and $781,769.00 in forfeiture for Isen.

These consolidated appeals followed.

**II**

Chartier makes three arguments on appeal. First, he argues that the district court erred by instructing the jury that it could convict him of making material misstatements under Rule 10b-5 if he "caused" such misstatements to be made. Second, he argues that the district court erred by instructing the jury that it could find that he engaged in "matched trades" if he or his co-conspirators "controlled" both sides of the trade, notwithstanding the fact that Chartier did not coordinate directly with the purchasers. Chartier argues that each of these two errors requires that we vacate his securities fraud conviction under *Yates v. United States*, 354 U.S. 298 (1957). Isen joins in this argument. Third, Chartier asserts that his sentence of 120 months was substantively unreasonable because his co-defendant Isen, who was more culpable, received only 60 months.

Isen also raises three arguments on appeal. First, he argues that the evidence at trial was insufficient to show that he joined a single, overarching conspiracy that encompassed Chartier and Lee—rather than a smaller conspiracy that

---

[8] "The government appealed Watts's sentence as substantively unreasonable," and we remanded for resentencing. Appellee's Br. 46; *see Watts v. United States*, Nos. 21-2925, 21-3028, 2023 WL 2910634, at *6 (2d Cir. Apr. 12, 2023).

encompassed only himself, Watts, Matz, and Gleckman. Isen claims that the evidence effected a prejudicial variance from the indictment, which charged a single conspiracy. Chartier joins in this argument. Second, Isen argues that if there was no single conspiracy, we must remand for resentencing because the district court erred in calculating the loss under § 2B1.1 of the guidelines. According to Isen, the district court erroneously measured the loss as the amount by which the market capitalizations of the companies were inflated rather than as the loss to identifiable victims of the Boiler Room, and it failed to adjust the loss calculation to account for extraneous events that may have affected the stock prices. Third, Isen argues that the district court made two arithmetical errors in calculating his overall offense level for purposes of the guidelines.

## A

We consider the question of whether the evidence presented at trial constituted a variance from the indictment *de novo*. *See United States v. D'Amelio*, 683 F.3d 412, 416 (2d Cir. 2012). To prove a conspiracy, "the government must show that two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent," *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010), and "that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal," *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990).

"A single conspiracy may be found where there is mutual dependence and assistance among the participants, a common aim or purpose or a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture." *United States v. Vanwort*, 887 F.2d 375, 383 (2d Cir. 1989) (internal quotation marks and alterations omitted). "A single conspiracy may encompass members who neither know one another's identities nor specifically know of one another's involvement." *United States v. Sureff*, 15 F.3d 225, 230 (2d Cir. 1994) (citation omitted). In addition, "a single conspiracy is not

11

transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." *United States v. Berger*, 224 F.3d 107, 114-15 (2d Cir. 2000) (quoting *Maldonado-Rivera*, 992 F.2d at 963).

"Whether the government has proved a single [conspiracy] or multiple conspiracies is a question of fact for a properly instructed jury." *United States v. Khalupsky*, 5 F.4th 279, 288 (2d Cir. 2021) (alteration omitted) (quoting *Sureff*, 15 F.3d at 229). In assessing the sufficiency of the government's evidence of a single conspiracy, we "must view the evidence in the light most favorable to the government, and construe all permissible inferences in its favor." *Vanwort*, 887 F.2d at 383 (alteration omitted) (quoting *United States v. Heinemann*, 801 F.2d 86, 91 (2d Cir. 1986)). "A variance occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Dove*, 884 F.3d 138, 149 (2d Cir. 2018) (quoting *D'Amelio*, 683 F.3d at 417). "[R]eversal is only warranted for a variance if the defendant shows both: (1) the existence of a variance, and (2) that 'substantial prejudice' occurred at trial as a result." *Id.*

Isen argues that "[w]hile there may be evidence … that Isen joined a separate smaller conspiracy with Matz, Watts and Gleckman, there is insufficient evidence that he joined the single conspiracy with Chartier that was charged in the indictment. Therefore, the evidence resulted in a variance." Isen Br. 55-56. The district court correctly instructed the jury that "[p]roof of several separate and independent conspiracies is not proof of [the] single overall conspiracy charged in [Counts 1, 2, and 8] in the indictment" and that "[i]f you find the evidence proves that separate conspiracies existed, you must acquit on those counts." Isen App'x 1452. The district court's explanation of the distinction between a single conspiracy and multiple conspiracies was likewise appropriate. Because the jury was correctly instructed on this issue, its finding of a single conspiracy as opposed to multiple conspiracies must be affirmed so long as, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found [a single

12

conspiracy] beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

The evidence presented at trial was sufficient to allow a rational jury to find a single conspiracy beyond a reasonable doubt. Trial testimony established that Isen visited the Boiler Room "[a]t least five or six" times to observe its operations "while account executives were making calls to push stock." Isen App'x 292. The jury could reasonably have inferred that Isen, as a formerly licensed securities broker, would have understood the nature and general scope of the Boiler Room's operations. As the district court stated at Isen's sentencing hearing:

> If you couldn't figure out that Mr. Erik Matz was stealing, was making up stories, then [you] must have been oblivious to the many years [you] spent in the securities field. There is no way that you didn't know what Mr. Matz was up to.

Isen Special App'x 158. In addition, while Matz and Watts were the point people for executing the trades, Isen prepared and sent the fraudulent invoices to conceal the illegal payments to the Boiler Room. These facts would have allowed a rational jury to make "a permissible inference, from the nature and scope of the operation, that [Isen] was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture." *Vanwort*, 887 F.2d at 383 (quoting *Bertolotti*, 529 F.2d at 154). Finally, there was evidence that Isen actively assisted Matz in his efforts to push Chartier's stocks, including by consulting with Matz regarding marketing materials for Chartier's stocks, advising Matz on the use of fraudulent consulting agreements to conceal the nature of the Boiler Room's arrangements with Chartier and Lee, and providing Matz with trading data on one of Chartier's stocks. These facts are sufficient to allow a rational jury to conclude that there was "mutual dependence and assistance" between Isen, Matz, and Chartier—and thus a single overarching conspiracy to commit securities fraud. *Id.*

Because we conclude that there was no variance from the indictment, we need not address the questions of prejudice and the loss calculation.

**B**

The parties agree that the district court made two errors in calculating Isen's offense level. In its statement of reasons, the district court calculated an offense level of 39 and stated that it was not applying the enhancement "described in paragraphs 145 and 151 of the Presentence Investigation Report"—that is, the enhancement under U.S.S.G. § 3B1.1(a) for an organizer or leader of a conspiracy. Statement of Reasons 4. The government argues, based on the district court's explanation at sentencing, that the district court actually intended to apply the four-level organizer or leader enhancement under § 3B1.1(a) and instead intended to reject the proposed four-level enhancement under § 2B1.1(b)(20)(A) for investment advisor status. That calculation would result in an offense level of 41—higher than the level at which the district court arrived. Isen contends that the district court did not intend to apply either enhancement, which would result in an offense level of 37.

"When we review a district court's calculation of the Guidelines sentencing range, we 'apply a *de novo* standard to legal conclusions and accept the sentencing court's factual findings unless they are clearly erroneous.'" *United States v. Brown*, 945 F.3d 72, 75 (2d Cir. 2019) (alteration omitted) (quoting *United States v. Pereira-Gomez*, 903 F.3d 155, 161 (2d Cir. 2018)). "Preserved errors in calculating the Guidelines are subject to harmless error review." *Id.*

Even if Isen were correct and the district court intended an offense level of 37, we conclude that the error would be harmless. The Supreme Court has explained that "[t]here may be instances when, despite application of an erroneous Guidelines range, a reasonable probability of prejudice does not exist." *Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016). "The record in a case may show, for example, that the district court thought the sentence it chose was appropriate irrespective of the Guidelines range." *Id.* Isen's sentence of 60 months of

14

imprisonment was far below the guidelines range of 262 to 327 months for an offense level of 39 and a criminal history category of I. The transcript of Isen's sentencing indicates that the district court gave significant weight to mitigating factors—in particular, Isen's age, health problems, family responsibilities, and good standing in the community—and sentenced him to the minimum amount of prison time commensurate with the seriousness of his crime. We therefore agree with the government that the district court "would have imposed the 60-month sentence regardless of the Guidelines range" and that any error in calculating Isen's offense level was harmless. Appellee's Br. 110.

## C

We now turn to Chartier's arguments that the district court's jury instructions contained two *Yates* errors. First, we address the argument that the district court's instructions regarding fraudulent misrepresentations or omissions were erroneous under *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). We conclude that even if the instructions were erroneous under *Janus*, such error was harmless and vacatur is not required under *Yates*. Second, we address Chartier's challenge to the district court's instructions regarding matched trades and conclude that those instructions were not plainly erroneous.

## 1

While explaining certain terms and phrases in Rule 10b-5 to the jury, the district court gave the following instruction:

> [T]he Government need not prove that the defendant personally made the misrepresentation or that he omitted the material fact. It is sufficient if the Government establishes that the defendant knowingly and intentionally caused the statement to be made or the fact to be omitted with the intent to defraud. On this point, the Government must prove the defendants were aware that false and misleading statements were being made. With regard to the alleged misrepresentations and omissions, you must determine whether the

15

statement was true or false when it was made, and, in the case of the alleged omissions, whether the omission was misleading.

Isen App'x 1443. In *Janus*—which involved a private action rather than an enforcement action by the government—the Supreme Court held that "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus*, 564 U.S. at 142. Chartier argues that the instruction was erroneous because "it was the Government's burden to demonstrate that Chartier actually 'made' the false statement in question—*i.e.*, that he exercised 'ultimate authority' over any material false statement, 'including its content and whether and how to communicate it.'" Chartier Br. 34-35.[9]

"Generally speaking, if a defendant did not object to [a jury] instruction, a 'plain error standard of review applies.'" *United States v. Prado*, 815 F.3d 93, 100 (2d Cir. 2016) (quoting *United States v. Botti*, 711 F.3d 299, 308 (2d Cir. 2013)). "The Supreme Court made clear in *Yates v. United States*, 354 U.S. 298 (1957) that a jury verdict constitutes legal error when a jury, having been instructed on two disjunctive theories of culpability, one valid and the other invalid, renders a guilty verdict in circumstances that make it impossible to tell which ground the jury selected." *United States v. Laurent*, 33 F.4th 63, 86 (2d Cir. 2022). "We have held, however, that such errors of the *Yates* variety are subject to harmless error analysis." *Id.*

We need not decide whether the instruction was erroneous because, even if it was, that error was harmless. "Where a jury's finding of guilt, based on a predicate that cannot lawfully sustain guilt, nonetheless necessarily required that

---

[9] The government suggests that the district court's instruction was appropriate because *Janus* applies only to private actions and not to criminal enforcement actions by the SEC. One federal court of appeals has held that *Janus* does not apply to criminal enforcement actions. *See Prousalis v. Moore*, 751 F.3d 272, 276 (4th Cir. 2014). We do not reach that issue here.

the jury have found facts satisfying the essential elements of guilt on the alternative charged predicate that would sustain a lawful conviction," the error is "harmless" and vacatur of the conviction is not required under *Yates*. *Laurent*, 33 F.4th at 86.

Chartier and Isen were charged with aiding and abetting securities fraud under Rule 10b-5, and Chartier acknowledges that the aiding-and-abetting theory could have been a "valid bas[i]s to convict [him]." Chartier Br. 43; *see also* 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."). The district court instructed the jury that "[i]n order to aid or abet another to commit a crime, it is necessary that the defendant knowingly associate himself in some way with the crime, and that he participate in the crime by doing some act to help make the crime succeed." Isen App'x 1441. Accordingly, the government needed to "establish that the defendant acted willfully, knowingly and with intent to defraud" and "engaged in some affirmative conduct or overt act for the specific purpose of bringing about that crime." *Id.*

Chartier and Isen do not challenge the district court's instructions on aiding and abetting. A finding by the jury that Chartier and Isen "knowingly and intentionally caused" false statements to be made or material facts to be omitted "with the intent to defraud" would amount to a finding that they aided and abetted such statements or omissions, and such a finding would allow punishment "as a principal." 18 U.S.C. § 2(a). We therefore hold that any error in the district court's instructions on false or misleading statements or omissions was harmless. *See Laurent*, 33 F.4th at 86.

**2**

Chartier argues that the district court committed a *Yates* error by instructing the jury that it could convict him of securities fraud if it found that he engaged in "matched trades," which the district court described as "similar to wash trades, but involv[ing] related persons or parties who control both sides of the trade." Isen

17

App'x 1443. In Chartier's view, a matched trade requires "direct coordination between the Defendant-sellers and the investor-buyers—*i.e.*, the parties who actually *placed* the buy and sell orders." Chartier Br. 39. In other words, a transaction is not a "matched trade" unless beneficial ownership of the security remains within the conspiring group. *See also SEC v. Masri*, 523 F. Supp. 2d 361, 366 (S.D.N.Y. 2007) (describing "matched orders and wash sales" as "fictitious transactions [that] do not result in any change of beneficial ownership").

Because Chartier did not object to the district court's instructions, we review for plain error. To be "plain," an error must be "clear or obvious, rather than subject to reasonable dispute." *Prado*, 815 F.3d at 100 (quoting *Marcus*, 560 U.S. at 262). We conclude that it is not clear or obvious that it is inaccurate to describe Chartier's transactions with Boiler Room victims as "matched trades." Chartier states that Congress has "explicitly define[d] what constitutes a matched or wash trade" in § 9(a)(1) of the Securities Exchange Act of 1934. Chartier Br. 38. That section provides that "[i]t shall be unlawful for any person" to do the following:

> For the purpose of creating a false or misleading appearance of active trading in any security other than a government security, or a false or misleading appearance with respect to the market for any such security, (A) to effect any transaction in such security which involves no change in the beneficial ownership thereof, *or* (B) to enter an order or orders for the purchase of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties, *or* (C) to enter any order or orders for the sale of any such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been or will be entered by or for the same or different parties.

15 U.S.C. § 78i(a)(1) (emphasis added). The statute is written in the disjunctive; it prohibits traders from *either* entering into sham transactions that "involve[] no

18

change in the beneficial ownership" of the subject security *or* placing buy or sell orders with the knowledge that a matching order has been or will be placed—and in either case to do so "[f]or the purpose of creating a false or misleading appearance of active trading in any security other than a government security, or a false or misleading appearance with respect to the market for any such security." *Id.* A plausible reading of the statute defining "matched trades" is that it does *not* require that there be no effective change in beneficial ownership or that ownership of the security remain within the conspiring group. Rather, a "matched trade" may occur when a trader buys or sells with the knowledge that there is a matching order on the other side *and* does so for one of the two prohibited purposes listed at the beginning of § 9(a)(1).

Of course, Chartier and Isen were not charged with violations of 15 U.S.C. § 78i. The point is that the district court's definition of a "matched trade"—a transaction "involv[ing] related persons or parties who control both sides of the trade"—plausibly falls within definition of a "matched trade" given by Congress in 15 U.S.C. § 78i. And there is no question that such a transaction would fall within the "broad language" of 15 U.S.C. § 78j(b) and Rule 10b-5, which, "on its face, extends to manipulation of all kinds, whether by making false statements or otherwise." *United States v. Royer*, 549 F.3d 886, 900 (2d Cir. 2008). We hold that the district court's instructions to the jury on matched trades were not plainly erroneous.

## D

Chartier's final argument is that his sentence was substantively unreasonable due to the disparity between his sentence and Isen's. "A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008). "We will … set aside a district court's *substantive* determination only in exceptional cases where the trial court's decision 'cannot be located within

the range of permissible decisions.'" *Id.* at 189 (quoting *United States v. Rigas*, 490 F.3d 208, 238 (2d Cir. 2007)).

The district court determined that Chartier's total offense level was 34 and his criminal history category was I, which resulted in a guidelines range of 151 to 188 months of imprisonment.[10] By contrast, the district court determined that Isen's total offense level was 39 and his criminal history category was I, which resulted in a guidelines range of 262 to 327 months of imprisonment. Moreover, Chartier observes that (1) "while [his] only criminal history related to a DUI incurred when he was twenty-four years old, this was Isen's *second federal conviction for securities fraud*," and (2) Chartier was "the sole caretaker of two minor children … who, at the time of his sentencing, were nine and six respectively, and suffering from panic attacks and separation anxiety." Chartier Br. 54. Despite these factors, the district court sentenced Chartier to 120 months of imprisonment while sentencing Isen to only 60 months of imprisonment. Chartier argues that this disparity, which "[t]he court made no effort to explain," rendered his sentence substantively unreasonable. *Id.*

We disagree. First, Chartier bases his challenge on 18 U.S.C. § 3553(a)(6), which requires a district court to consider the need to avoid unwarranted sentencing disparities among similarly situated defendants. We have explained, however, that "section 3553(a)(6) requires a district court to consider nationwide sentence disparities, but does not require a district court to consider disparities between co-defendants." *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008).

Second, even if the district court were required to consider disparities among co-defendants, evidence in the record supported the district court's decision to impose a shorter sentence on Isen than on Chartier. According to the Probation Office's calculations—which used the same market-capitalization-based

_____

[10] The district court declined to apply the four-level enhancement for registered broker-dealer status to Chartier, reducing his offense level from 38 to 34.

method for both defendants—Chartier's fraudulent activities resulted in a loss of $87,189,670, more than twice the loss of $43,005,450 attributed to Isen. Chartier made several false statements in his post-arrest interview, including that "he did not engage in wash or matched trading and that he did not know the Boiler Room or Matz." Isen App'x 1993. At Chartier's sentencing, the district court indicated that Chartier was not being truthful to the court about his conduct and did not express remorse. By contrast, the district court took note of the fact that Isen had "re-made himself in the solar industry" and participated in charitable activities. Isen Special App'x 158. The district court considered Chartier's responsibilities as caretaker for his two young children but noted that Chartier was by no means unique among criminal defendants in that respect: "[T]here are many people that go to jail and their children have to be taken care of by others. I would say the vast majority of people convicted of drug crimes, if they have children, they don't see their children for long periods of time." Chartier App'x 756. Additionally, the district court accorded significant mitigating weight to Isen's medical problems, which it described as "really serious." Isen Special App'x 159; *see also* 18 U.S.C. § 3553(a)(2)(D) (requiring sentencing courts to consider the need to "provide the defendant with needed … medical care … in the most effective manner"). The Probation Office advised that Isen's various health issues would exacerbate the burdens of a prison sentence. *See* Isen PSR 57. It was not unreasonable on this record for the district court to conclude that the evidence supported a shorter sentence for Isen than for Chartier.

Chartier disagrees with the weight that the district court assigned to each defendant's mitigating factors and its assessment of the co-defendants' relative culpability. But we do not "substitute our own judgment for the district court's" regarding the statutory sentencing factors. *Cavera*, 550 F.3d at 189. The district court's sentencing decision in this case was "within the range of permissible decisions." *Id.* (quoting *Rigas*, 490 F.3d at 238).

*     *     *

We have considered Chartier's and Isen's remaining arguments, which we conclude are without merit. For the foregoing reasons, we affirm the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court